Slip Op. 11- 122

# *UNITED STATES COURT OF INTERNATIONAL TRADE*

---

|  |  |  |
|---|---|---|
| ADVANCED TECHNOLOGY & MATERIALS CO., LTD., BEIJING GANG YAN DIAMOND PRODUCTS COMPANY, and GANG YAN DIAMOND PRODUCTS, INC., | : : : : : | |
| Plaintiffs, | : : | |
| BOSUN TOOLS GROUP CO. LTD, | : : | |
| Plaintiff-Intervenor, | : : | |
| v. | : : | Before: R. Kenton Musgrave, Senior Judge Consol. Court No. 09-00511 |
| UNITED STATES, | : : | |
| Defendant, | : : | **PUBLIC VERSION** |
| and | : : | |
| DIAMOND SAWBLADES MANUFACTURERS COALITION, WEIHAI XIANGGUANG MECHANICAL INDUSTRIAL CO., LTD., and QINGDAO SHINHAN DIAMOND INDUSTRIAL. CO., LTD., | : : : : : : | |
| Defendant-Intervenors. | : : | |

---

### OPINION AND ORDER

[Remanding for further explanation on the question of separate rates and granting defendant's consent motion for remand to reconsider surrogate steel values. ]

Dated:  October 12, 2011

*Barnes, Richardson & Colburn* (*Jeffery S. Neeley*, *Michael S. Holton* and *Stephen W. Brophy*) for Plaintiffs.

*Tony West*, Assistant Attorney General; *Jeanne E. Davidson*, Director, and *Franklin E. White, Jr.*, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (*Delisa M. Sanchez*); Office of the Chief Counsel for Import Administration, U.S. Department of Commerce (*Hardeep K. Josan*), Of Counsel, for Defendant.

*Wiley Rein, LLP* (*Daniel B. Pickard* and *Maureen E. Thorson*) for Diamond Sawblades.

Musgrave, Senior Judge:  This consolidated action concerns the final less than fair value ("LTFV") determination issued by the International Trade Administration, United States Department of Commerce ("Commerce" or "the Department") in the antidumping investigation of diamond sawblades imported from the People's Republic of China.  *See Diamond Sawblades and Parts Thereof From the People's Republic of China*, 71 Fed. Reg. 29303 (May 22, 2006) (final LTFV determination) ("*Final Determination*"), *as amended,* 71 Fed. Reg. 35864 (June 22, 2006). Plaintiffs Advanced Technology & Materials Co. Ltd., Beijing Gang Yan Diamond Products Company, and Gang Yan Diamond Products, Inc. ("ATM") challenge several aspects of the *Final Determination* including (1) the Department's use of zeroing to calculate the weighted-average dumping margin; (2) the selection of Carborundum financial data to calculate surrogate financial ratios; and (3) the Department's valuation of certain steel inputs.  *See* ATM's Mot. at 1-2. Defendant-Intervenor Diamond Sawblade Manufacturers Coalition ("DSMC") challenges the Department's country of origin determination and its decision to award ATM a separate rate.  ATM and DSMC move for judgment on the agency record, and the Department also moves for voluntary remand to reconsider aspects of its selection of surrogate values for steel used to produce diamond sawblade cores, which moots ATM's third cause of action.[1]

---

[1] Further, the court also need not address ATM's first contention because argument thereon was addressed in Slip Op. 11-105.  To the extent any arguments remain, past precedent of this Court has shown them to be without merit.

The court exercises jurisdiction pursuant to 28 U.S.C. § 1581(c), under which the Court of International Trade is granted exclusive jurisdiction of any civil action commenced under 19 U.S.C. § 1516a.  The court reviews the *Final Determination* on the basis of the agency record. *See* 28 U.S.C. § 2640(b); 19 U.S.C. § 1516a(b)(1)(B)(i).  Upon such review, the court must "hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i). "Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  As requested by the Department and for the reasons set forth below, this matter will be remanded for further consideration.

*Discussion*

I.  Surrogate Financial Data

An accurate calculation of normal value necessarily includes selling, general and administrative expenses ("SG&A"), overhead, and profit.  For non-market economy producers, Commerce estimates these items by using the financial ratios of a surrogate producer, *i.e.*, a "producer[] of identical or comparable merchandise in the surrogate country."  19 C.F.R. § 351.409. Commerce chose India as an appropriate surrogate country for the investigation of PRC producers, but industry-specific information was apparently unavailable at the time of the preliminary determination, and therefore Commerce used financial ratios taken from the *Reserve Bank of India Bulletin* (August 2005) ("RBI data").  The RBI data "include[ ] the experience of 2,201 public limited companies in India, including Tea plantations, Mining & Quarrying, Food Products &

Beverages, Sugar, Edible Oils, Cotton, Paper Products, Chemical Products, Paint, and Medicines."
Issues and Decision Memorandum ("Decision Mem.") at 8.

After issuance of the preliminary determination, DSMC placed on the record specific financial reports of two Indian producers of grinding wheels and abrasive products, namely Grindwell Norton, Ltd., ("Norton") and Carborundum Universal Limited ("Carborundum"). After examination of these financial reports, Commerce determined that the Carborundum data were the best choice of the three available data sets (RBI data, Norton, Carborundum), and, accordingly, recalculated the SG&A expenses using Carborundum's financial ratios. Commerce declined to use the Norton financials because that data predated the period of investigation by more than three years.

ATM argues Commerce's choice to use Carborundum's financial data is erroneous because (1) substantial evidence does not support the conclusion that grinding wheels are comparable to diamond sawblades; (2) the record contains no clear indication that Carborundum produced grinding wheels during the financial statement period; and (3) the RBI data are less likely to be distortive and therefore represent the "best available information" required by 19 U.S.C. § 1677b(c)(1) (the Department's valuation "shall be based on the best available information regarding the value of such factors in a market economy country or countries considered to be appropriate"). However, in reviewing the *Final Determination* the question before the court is not "whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information." *Goldlink Indus. Co. v. United States*, 30 CIT 616, 619, 431 F. Supp. 2d 1323, 1327 (2006). For the reasons discussed below, the

court finds the Department's selection of the Carborundum data was reasonable and is supported by substantial evidence.

To determine whether two products are comparable, Commerce typically considers whether they had similar physical characteristics, end uses, and production processes. *See*, *e.g.*, ATM's Mot. at 25-33.  Contrary to ATM's allegations, however, Commerce did not ignore these factors.   The Department observed that diamond sawblades and grinding wheels both physically function as abrasives, that is, "by abrading the materials against which they are placed in a grinding process" instead of cutting the material.  Decision Mem. at 8 (referring to description set forth in the original Petition).  The Department also recognized differences in the products, *i.e.*, that diamond sawblades use a different abrading component (diamonds) than grinding wheels, and it also observed that all of the respondents produced grinding wheels that use a diamond abrasive.  The Department noted that both products are used in the construction and infrastructure industry but disagreed that comparable products necessarily must have identical end users.  *Id*. at 8.

ATM contends that the Department should have considered that the production of diamond sawblades requires expensive raw materials not used in grinding wheels and that these differences would distort the SG&A ratio.  While this is a colorable argument, ATM does not point to record evidence to support it.  Diamonds or diamond powders may or may not be an expensive material, but all record indications are that they are apparently used in extremely small quantities. The court cannot assume the existence of such distortions when none are immediately apparent. Moreover, it is not necessary for Commerce to "duplicate the exact production experience" of non-

market economy manufacturers, or "undergo an item-by-item accounting" when determining

production costs. *Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999).

Next, ATM contends that even assuming grinding wheels are comparable, nothing

in the record indicates Carborundum produced grinding wheels during the financial statement period.

According to ATM, Carborundum's statement noting its efforts "resulted in . . . the development of

new products such as thread grinding wheels" should only support the conclusion that Carborundum

was developing the capability to produce such grinding wheels, not that it actually produced them.

ATM's Mot. at 34-35. The government asserts that the court should reject this argument because

it was never presented at the agency level, and that even if the court were to consider it, the

Department's interpretation of the financial statement language was reasonable. Def's Mot. in

Opp'n at 32.

The court agrees with the government. The comment in the financial statement is

ambiguous at best, and the Department's interpretation of it is not unreasonable. More importantly,

ATM should have raised this question when the matter was before Commerce. The doctrine of

administrative exhaustion of remedies is "appropriate in the antidumping context because it allows

the agency to apply its expertise, rectify administrative mistakes," and advances "the twin purposes

of protecting administrative agency authority and promoting judicial efficiency." *Carpenter Tech.*

*Corp. v. United States*, 30 CIT 1373, 1374-75, 452 F. Supp. 2d 1344, 1346 (2006). The Court has,

of course, found exceptions when requiring exhaustion would be futile, a useless formality, or in the

face of a manifestly inadequate remedy, *see*, *e.g.*, *Alhambra Foundry Co., Ltd. v. United States*, 12

CIT 343, 685 F. Supp. 1252, 1256 (1988), but this is not one of those. The contention ATM

attempts to press is a simple factual matter that could have been resolved with relative ease when the matter was before Commerce, but now that it has moved here, resolution would require far more involvement and undercut Commerce's factual determination process. The court will therefore not consider it further.

Finally, the court must reject the contention that the RBI data present the least distortive financial ratios. Where Commerce is faced with the choice of selecting from among imperfect alternatives, it has discretion to select the best available information for a surrogate value so long as its decision is reasonable. ATM does not persuade that Commerce's selection of Carborundum data over the RBI data was unreasonable, and the court cannot substitute its judgment for that of Commerce.

## II.  Country of Origin

DSMC challenges the Department's conclusion that the country of origin for diamond sawblades was the country in which the diamond segments were joined to the core, and it specifically challenges the conclusion that assembly of this nature constituted a "substantial transformation." DSMC contends the Department erred in this regard because (1) "substantial transformation" could not have occurred where the end product (finished sawblades) is in the same class or kind of merchandise as the cores and segments; (2) the Department "did not employ its normal analysis" for substantial transformation and failed to explain the reasons for doing so; and (3) such a conclusion seriously undermines the relief afforded by the order "by permitting the subject merchandise to become non-subject" simply by joining the components in a third country. DSMC's Mot. at 14, 19, 31. For the reasons that follow, the court does not agree.

The scope of an antidumping duty order is "defined by the *type of merchandise* and the *country of origin* (e.g, widgets from Ruritania)" and therefore the determination of where the merchandise is produced or manufactured is a fundamental step in the administration of the antidumping laws. *Ugine and Alz Belgium, N.V., v. United States*, 31 CIT 1536, 1550-51, 517 F. Supp. 2d 1333, 1345 (2007) (quoting and italicizing *Certain Cold Rolled Carbon Steel Flat Products from Argentina*, 58 Fed. Reg. 37062, 37065 (Jul. 9, 1993) (final LTFV determination)). The Department's " 'substantial transformation' rule provides a yardstick for determining whether the processes performed on merchandise in a country are of such significance as to require that the resulting merchandise be considered the product of the country in which the transformation occurred." *E.I. DuPont de Nemours & Co., v. United States*, 22 CIT 370, 373-74, 8 F. Supp.2d 854, 858 (1998).

The factors used to determine whether "substantial transformation" has taken place include: (1) whether the processed downstream product falls into a different class or kind of merchandise from the upstream product; (2) whether the essential component of the merchandise is substantially transformed in the exporting country; and (3) the extent of processing in the exporting country. Def's. Resp. in Opp'n. at 40 (citing *Erasable Programmable Read Only Memories (EPROMs) From Japan*, 51 Fed. Reg. 39680 (Oct. 30, 1986) (final LTFV determination)) ("*EPROMs*").

In addressing DSMC's arguments, the Department acknowledged that in certain determinations it has placed greater emphasis on whether the downstream product falls into a different class or kind of merchandise, but it asserts that this factor is not controlling because the

determination is essentially made "on a case-by-case basis." Decision Mem. at 18. By way of illustration, the Department discussed two investigations where the difference in "class or kind of merchandise" was not a point of focus. *Cf. EPROMs* (above) *with 3.5″ Microdisks and Coated Media Thereof From Japan*, 54 Fed. Reg. 6433 (Feb. 10, 1989) (final LTFV determination) ("*Microdisks*").

In both of the referenced investigations the subject merchandise was defined to include a finished product as well as components of the finished product. In *EPROM*s, the subject merchandise included the EPROM itself ( "a type of memory integrated circuit") as well as the main components of the *EPROM*, referred to as "processed wafers [and] dice." In spite of the fact that EPROMs are in a different class or kind of merchandise from the component wafers and dice, the Department found that assembly of the wafers and dice did not constitute a substantial transformation. The Department reasoned that (1) the processed wafer is not only a major component of the finished device, it is *the* essential active component that defines the merchandise, (2) assembly does not add to its essential characteristics, and (3) assembly is fairly unsophisticated process that could be accomplished with relative ease in a third country. *EPROM's*, 51 Fed. Reg. at 39692.

In *Microdisks* the subject merchandise was defined as "microdisks and coated media thereof," which again concerns a finished product (microdisks), and a component of the product (coated media) described as "the flexible recording material used in the finished microdisk." 54 Fed. Reg. at 6434. Although microdisks and coated media are in the same class or kind of merchandise, Commerce concluded that the process of turning coated media into a finished microdisk was a

substantial transformation.  According to the Department, the finishing process (1) was "extremely important to the technical performance levels" of the end product, (2) required "substantial capital outlay and an extremely high degree of technical precision," and  (3) entailed the use of "state of the art equipment and highly trained technical personnel."  The Department noted further that although the coated media comprised "only a small fraction" of the finished microdisk, the finishing process was not "the type of operation that can be set up and undertaken easily in any country."  54 Fed. Reg. at 6434.

The Department's decision in the matter at bar essentially turned on whether the process of assembling diamond segments to cores is more like the process described in *EPROMs* or more like the one in *Microdisks*.  Commerce concluded they were more like the latter.  In so finding, Commerce noted the expense and technical expertise required for welding or brazing the cores to the segments, the importance of that process in relation to the ultimate performance of the sawblade, and the capital investment that would be needed to undertake such an operation.  Of additional weight was its determination that assembly imparted the "essential quality" of the sawblade because the sawblade could not be used until that process occurred.

Although DSMC points to factors supporting the opposite conclusion for each of the findings, it is not the role of the court to reweigh evidence, and "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 619-20 (1966).  *See Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984).  Accordingly, the Department's country of origin determination is sustained.

### III.  Separate Rates

DSMC contends that the Department's separate rates analysis is inadequate and requires remand because the Department failed to consider important aspects of the problem. Specifically, DSMC contends that the Department erred in refusing to consider evidence showing that ATM's majority shareholder, the Central Iron and Steel Institute ("CISRI"), is a state owned enterprise that is wholly owned and controlled by the State Asset Supervision and Administration Commission ("SASAC"), a PRC government agency.

DSMC states that during the investigation it placed on the record evidence indicating, among other things, (1) CISRI controls ATM via its position as majority stockholder and through the sharing of management and directors, (2) CISRI, in turn, is wholly owned by the PRC government agency known as SASAC, (3) CISRI is controlled by SASAC, and (4) Decree No. 378 of the State Council of the PRC[2] that demonstrates the central government's intent to reassert control through SASAC, which is charged with "exercising full 'ownership' rights with regard to companies under its supervision."  DSMC's Mot. at 8.  DSMC alleges that, in spite of the relevance of this information to the question of the ultimate holder of *de jure* and *de facto* control, Commerce simply rejected it on the ground that it was not the Department's practice to consider whether "parent" companies are government controlled.

The defendant states that Commerce "properly limited its analysis to the activities of [ATM] rather than CISRI and SASAC" because it is the Department's practice to "to examine controls over the investment, pricing, and output decision-making process at the individual firm

---

[2]  DSMC refers to this decree as "Interim Regulations."

level," Def's. Resp. in Opp'n. at 40, and that DSMC is essentially asking Commerce to change its longstanding policy. The government argues further that the Issues and Decision Memorandum shows that Commerce fully considered the evidence presented by DSMC, pointing out, for example, the Department's observation that CISRI representatives "were a minority on  [ATM]'s board of directors, of which others included representatives of [ATM] and members independently appointed by the stock exchange committee." *Id*. at 41.

In support of the government, ATM contends that the Department's analysis was rational and supported by past practice, noting that "[e]xporters have not been required to show the total absence of any governmental involvement . . . [the Department] has, quite logically, focused on the control over exports since it is this pricing that it believes could be influenced by governmental interference." ATM points to several determinations where the Department granted separate rates to companies in similar or identical situations.

ATM also contends that CISRI is not a state-owned enterprise, but an enterprise "owned by all the people," which does not require a finding of government control. In that regard, ATM argues that DSMC has pointed to only one piece of evidence on the record that would otherwise connect the central government with the ATM entity: Decree No. 378 of the State Council. According to ATM,  DSMC failed to "show why the decree on its face" compels a finding of state control over ATM," and provides its own analysis of the decree to demonstrate that it does not evince the type of control that would be relevant to a separate-rates analysis. ATM's Resp. in Opp'n. at 8.

In reviewing the *Final Determination*, the Court must consider, *inter alia*, whether the Department has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted). The agency must offer an explanation of the decision that is clear enough to enable judicial review, and cannot "leave vital questions, raised by comments which are of cogent materiality, completely unanswered." *United States v. Nova Scotia Food Prods.,* 568 F.2d 240, 252 (2d Cir.1977). For the reasons set forth below, the *Final Determination* must be remanded to the Department for further explanation.

For a non-market economy ("NME"), "the Department presumes that all companies within the NME country are subject to government control" unless they can demonstrate an absence of both *de jure* and *de facto* government control. *Import Administration Policy Bulletin 05.1.* Under this scheme, exporters found to be under government control are assigned the "PRC-wide" rate because they are assumed to comprise a single exporter under common government control, the "NME entity." *Certain Cut to Length Carbon Steel Plate from Ukraine*, 62 Fed. Reg. 61754, 61758 (Nov. 19, 1997) (final LTFV determination). Commerce explained that the purpose of applying one countrywide rate in this context is to prevent an NME government from later circumventing an antidumping order by controlling the flow of subject merchandise through exporters with the lowest dumping margin, *id.*, and that the policy is purportedly "analogous to [its] practice in market-economy cases of calculating individual dumping rates for affiliated parties unless [it] determine[s] that there is a significant potential for manipulation of pricing or production decisions."

*Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China,* 62 Fed. Reg. 6173, 6175 (Feb. 11, 1997) (final administrative review results).

Commerce, thus, determines the potential for government control or manipulation of NME firms via the *de jure* and *de facto* test set forth in *Silicon Carbide from the People's Republic of China*, 59 Fed. Reg. 22585 (May 2, 1994) (final LTFV determination). That test is an amplification of the test announced in *Sparklers from the People's Republic of China*, 56 Fed. Reg. 20588 (May 6, 1991) (final LTFV determination) ("*Sparklers*"), in which the Department determined that it will assign separate rates only if the applicant can demonstrate the absence of both *de jure* and *de facto* governmental control over export activities. The presumption of *de jure* control may be rebutted with a showing of (1) an absence of restrictive stipulations associated with an individual exporter's business and export licenses, (2) any legislative enactments decentralizing control of companies, and (3) other formal measures by the government decentralizing control of companies. *See Sparklers*, 56 Fed. Reg. at 20589. Regarding *de facto* government control, in accordance with *Silicon Carbide* (which added (3) and (4) of the following), the current presumption may be rebutted if an exporter demonstrates that it (1) sets its own export prices independent of the government and without the approval of a government authority, (2) has the authority to negotiate and sign contracts and other agreements, (3) retains the proceeds from its sales and makes independent decisions regarding the disposition of profits or financing of losses, and (4) has autonomy from the government regarding the selection of management. *See Silicon Carbide*, 59 Fed. Reg. at 22587.

It is now well established that "government ownership by itself is not dispositive" of government control. *Qingdao Taifa Group Co., Ltd., v. United States*, 33 CIT ___, ___, 637 F.

Supp. 2d 1231, 1242 (2009).  Firms that are wholly owned by the PRC government are not barred, *per se*, from a separate rate,  but this was not always the case.  Prior to the *Silicon Carbide* determination, the Department did not allow state-owned companies to receive a separate rate on the ground that "ownership by the central government enables the government to manipulate prices, whether or not it takes advantage of its opportunity to do so during the [period of investigation]." *Certain Compact Ductile Iron Waterworks Fittings and Accessories Thereof from the People's Republic of China*, 58 Fed. Reg. 37908 (July 14, 1993) (final LTFV determination); *Sebacic Acid From the People's Republic of China*, 59 Fed. Reg. 565 (Jan. 5, 1994) (preliminary LTFV determination).

Less than a year later, however, with issuance of *Silicon Carbide* the Department changed its position.  In that determination, the Department found, in light of new information concerning Chinese economic reforms, that PRC-owned companies designated as "owned by all the people" were sufficiently independent from government control to be eligible for a separate rate. The Department explained that "'owned by all the people' is not synonymous with government control . . .  [i]nstead, ownership by the people signifies that no individual can take the company; . . . [t]he company belongs to the community[,] and the company's employees are entrusted with the management of the company."  *Silicon Carbide*, 59 Fed. Reg. at 22586-87 (citations and internal quotes omitted).  The court notes that the respondents in that case were ultimately awarded separate rates premised upon the version of the *Sparklers* test that added the above third and fourth factors to the *de facto* analysis.[3]

_____

[3] It is also appropriate here to note that the "legislative enactments" providing the basis for
(continued...)

Of course, companies "owned by all the people" are but one of several ownership structures in the PRC. The separate rate application provides for six different types of ownership that apparently have been considered by the Department at one time or another. In this matter, the court's concern is with the ownership structure of ATM and BGY, which are both "limited liability companies."

Pursuant to the Company Law of the People's Republic of China, limited liability companies ("LLC's") are owned by shareholders, and control is allocated within a corporate structure similar to that used in market economies. *See*, *e.g.*, *Company Law of the Peoples Republic of China* (1999 amended) ("Company Law"), Art. 4 (providing that the shareholders of a company "have the right to . . . make major decisions, choose managers, *etc*., in accordance with the amount of capital they have invested in the company") (reproduced at ATM's Resp. In Opp'n., Appx, Ex. SA-4). The Department has determined that under the Company Law, control is devolved from the

---

[3] (...continued)

Commerce's finding of *de jure* independence in that investigation reflect the PRC government's devolution of control. These include the "Law of the People's Republic of China on industrial Enterprises Owned by the Whole People," ("1988 Law") and the "Regulations for Transformation of Operational Mechanism of State-Owned Industrial Enterprises" ("1992 Regulations"). Commerce found that these provisions shifted control of enterprises owned by all the people from the government to the enterprises themselves. According to the 1988 Law, enterprises owned "by the whole people" shall make their own management decisions, be responsible for their own profits and losses, choose their own suppliers, and purchase their own goods and materials. Other provisions in the 1988 Law also indicate that this type of enterprise in theory manages itself independently of the government. The 1992 Regulations provide that these same enterprises can set their own prices (Article IX); make their own production decisions (Article XI); use their own retained foreign exchange (Article XII); allocate profits (Article II); sell their own products without government interference (Article X); make their own investment decisions (Article XIII); dispose of their own assets (Article XV); and hire and fire their employees without government approval (Article XVII). *See Certain Partial-Extension Steel Drawer Slides With Rollers From the People's Republic of China*, 60 Fed. Reg. 29571, 29573 (June 5, 1995) (preliminary LTFV determination).

central government and "rests with the enterprise itself." *Freshwater Crawfish Tail Meat From the People's Republic of China*, 64 Fed. Reg. 8543 (Feb. 12, 1999) (new shipper preliminary review). Commerce has consistently found that governance by the Company Law establishes *de jure* independence from government control.[4]

And yet, under the Company Law, shareholders appear to hold substantial power. For example, Article 38 provides that shareholders vote (1) to decide on the business policy and investment plan of the company, (2) to elect and recall members of the board of directors and to decide on matters concerning the remuneration of directors, (3) to elect and recall supervisors appointed from among the shareholders' representatives, and to decide on matters concerning the remuneration of supervisors, (4) to examine and approve reports of the board of directors, (5) to examine and approve reports of the supervisory board or supervisors, (6) to examine and approve the annual financial budget plan and final accounts plan of the company, (7) to examine and approve plans for profit distribution of the company and plans for making up losses, (8) to adopt resolutions on the increase or reduction of the registered capital of the company, (9) to adopt resolutions on the issuance of company bonds, (10) to adopt resolutions on the assignment of capital contribution by a shareholder to a person other than the shareholders, (11) to adopt resolutions on matters such as the merger, division, transformation, dissolution and liquidation of the company, and (12) to amend the articles of association of the company. Company Law, Art. 38. *See also John D. Osgathorpe,*

---

[4] It is unclear when, or in which investigation, Commerce first analyzed the Company Law. The Company Law was not discussed or mentioned in either the preliminary or final determinations in *Certain Partial-Extension Steel Drawer Slides With Rollers From the People's Republic of China*, 60 Fed. Reg. 54472 (final LTFV determination), which is cited in at least 20 determinations as an example of the Department's "analysis" of that provision.

*A Critical Survey of the People's Republic of China's New Company Law*, 6 Ind. Int'l & Comp. L.

493 (1996); *Joaquin F. Matias, From Work-Units to Corporations: The Role of Chinese Corporate*

*Governance in a Traditional Market Economy*, 12 N.Y. Int'l L. Rev. 1 (1999).

        Although the Company Law delegates no control to the government as a matter of

law, it does not preclude the government from being a shareholder, or even a 100 percent

shareholder.  The potential for shareholder control is recognized in 19 U.S.C. § 1677(33)(E), which

defines "affiliated parties" as including "[a]ny person directly or indirectly owning, controlling, or

holding with the power to vote, 5 percent or more of the outstanding voting stock . . ." of another

organization.   19 U.S.C. § 1677(33)(E).   In *Tapered Roller Bearings*, *supra*, the Department

expressly rejected the affiliated parties analysis as an inappropriate measure of government control.

That decision, however, was premised, in part, upon recognition that "ownership by 'all of the

people' is not the type of 'ownership' addressed by section 771(33)." *Tapered Roller Bearings*, 62

Fed. Reg. at 6175 (parentheses omitted).  Here, in contrast, the type of ownership involved in an LLC

would seem to be precisely the type of ownership addressed by section 771(33).  Common ownership

is also a factor in the Department's collapsing analysis.  *See* 19 C.F.R. § 351.401(f)(2).  And as the

Department noted in *Tapered Roller Bearings*, "[o]wnership by all of the people signifies . . . that

'no individual can take the company . . . it belongs to the community.' " *Id*. (referencing *Silicon

Carbide*, 59 Fed. Reg. at 22586).  But logic would seem to dictate that when the PRC government

is the majority shareholder, much of the governmental control that supposedly "devolved" by virtue

of the Company Law was actually *re-allocated* (if it ever left) to the government by virtue of

shareholding on behalf of "all of the people."

The Department has addressed the government-as-shareholder problem in relatively few investigations.  Two cases decided shortly after the Company Law went into effect are *Certain Paper Clips From the People's Republic of China*, 54 Fed. Reg. 51168 (Oct. 7, 1994) (final determination) and *Certain Cased Pencils From the People's Republic of China*, 59 Fed. Reg. 55625 (Nov. 8, 1994) (final determination).  In these investigations, the Department's control analysis focused on the "significant" fact that the government did not vote its shares.  *See*, *e.g.*, *Cased Pencils*, 54 Fed. Reg. at 55627.   This was either because the shares themselves were non-voting shares (*Cased Pencils* ), or because the government entrusted its voting rights to management or the workers (*Paper Clips*).  *See also Disposable Pocket Lighters From the People's Republic of China*, 60 Fed. Reg. 22359, 22360 (May 5, 1995) (final LTFV determination).   The Department explained its reasoning as follows:

> When these companies were owned by all the "people," the central government devolved control of them.  Hence, we focused our examination on whether the change in ownership form to shareholding companies altered that devolution of control.  We found that it did not.  Significantly we found that the government (whether the central government or the Government of Shanghai) did not vote the shares.  Although the government held its shares on behalf of the people, in one case those shares were voted by the company's former general manager (Mr. Lansheng), and in the other by the workers (China First).

*Cased Pencils*, 54 Fed. Reg. at 55627.

The foregoing, albeit lengthy, background is necessary as context for proper consideration of DSMC's contentions concerning the instant *Diamond Sawblades* investigation. Therein, the Department addressed shareholder control in the context of its decision to collapse BGY, ATM, and HXF into a single entity.  In that analysis, the Department observed that ATM owns [[   ]] percent of BGY and [[     ]] percent of HXF, and that:

> There is significant potential for manipulation due to the common control of [ATM] over BGY and HXF. BGY, [ATM], and HXF have overlapping managers and directors. As stated in the Affiliation section above, in addition to serving as a President and Vice Chairman of the Board of Directors of AT &M, [[          ]] is also the Chairman of the Board and Legal Representative of BGY. Further, two Vice Presidents of [ATM] are also Directors of HXF.

*December 20, 2005 Memorandum from Senior Case Analyst to Director, Affiliation and Treatment as a Single Entity of BGY et. al*, C. R. Doc. 241 ("*Affiliation Memo*") at 8-9.

With the finding that ATM has control over BGY, DSMC presented evidence indicating that ATM, in turn, is controlled by CISRI through the latter's [[  ]] percent majority shareholding of ATM, that the shares are voting shares, that after CISRI the next-largest shareholder holds a [[  ]] percent interest, that [[    ]] of CISRI's board members sit on ATM's nine-member board of directors, and that [[            ]], ATM's President and Vice Chairman of the Board (who is also the Chairman of the Board and legal representative of BGY) also sits on the board of directors at CISRI.  Further, the court notes Article 99 of ATM's Articles of Association provides that only shareholders with a minimum [[  ]] percent stake in the company may nominate candidates for the board of directors,  and only CISRI meets this requirement.  *See* C. R. Doc. 226 at Ex. 1.

In turn, CISRI is 100 percent owned by a PRC government agency, and DSMC contends that CISRI is thus directly controlled by that government agency.

DSMC is not arguing that CISRI itself is an exporter or that it should have been considered in the collapsing analysis.  It is asserting that, through CISRI, the chain of shareholder control can be traced to the PRC government, and that the Department should *at least* investigate this possibility and, if true, come to a rational consideration of its implications.

Considering the argument, the court notes that although evidence seems to suggest that CISRI is "owned by the people," the Department has made no finding on the question.   In fact, the Department found the entire issue irrelevant to the analysis, stating:

> It is the Department's practice to examine controls over the investment, pricing, and output decision-making process at the individual firm level (*see, e.g., Certain Cut to- Length Carbon Steel Plate from Ukraine: Final Determination of Sales at Less than Fair Value*, 62 FR 61754, 61758 (November 19, 1997); *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 62 FR 61276, 61279 (November 17, 1997)), and not the activities of its owner, or its owner's parent company.   Therefore, for this analysis, we will limit our analysis to the activities of the AT&M single entity, rather than CISRI and SASAC.

> With respect to the *de jure* criteria listed above, Petitioner has placed on the record interim regulations, which allegedly undermine the independence of BGY and HXF under the Company Law of the PRC. However, we note that the Department has consistently found an absence of *de jure* control when a company's operations were governed by the Company Law of the PRC, and when it supplied business licenses and export licenses, each of which have been found to demonstrate an absence of restrictive stipulations and decentralization of control of the company. *See Honey From the People's Republic of China: Preliminary Results, Partial Rescission, and Extension of Final Results of Second Antidumping Duty Administrative Review*, 69 FR 77184, 77186-87 (December 27, 2004), and unchanged in *Honey from the People's Republic of China: Final Results and Final Rescission, In Part, of Antidumping Duty Administrative Review*, 70 FR 38873 (July 6, 2005).

> The information submitted by Petitioner addresses a theoretical control by SASAC over CISRI, rather than any control of the PRC government at any level over the numerous individual export decisions of the AT&M single entity that took place during the POI.   In addition, the Department conducted a detailed verification of the operational management and control of the AT&M single entity, including an examination of the AT&M single entity's companies' respective business licenses, export licenses, the Securities Law of the PRC, the Company Law of the PRC, and the Code of Corporate Governance, and found no evidence of any legislative or other restrictions on any of the export activities of the AT&M single entity. Therefore, we find for this final determination that the AT&M single entity has demonstrated a *de jure* absence of government control with respect to its export activities.

Decision Mem at 56-57.

Concerning *de facto* control, the Department found that BGY's questionnaire responses indicated that "it negotiated prices, selected management, and distributed profit independently of the government of the PRC," which were confirmed at verification with, *inter alia*, "board meeting minutes demonstrating that management is selected by the Board of Directors." *Id.* at 56.  In conclusion, the Department explained that

> because the Department examines companies' independence from government control with respect to their export decisions in a separate rates analysis (*see Silicon Carbide*, 59 FR at 22586-87 and *Sigma* 117 F. 3d at 1405-06), the Department has examined the *de facto* criteria with respect to the AT&M single entity based on the components of the single entity which exported subject merchandise to the United States during the POI. The Department confirmed at verification that the AT&M single entity made no exports of subject merchandise to the United States other than those of BGY and HXF.  *See* BGY Verification Report, at 6-7.

> Because AT&M is a single entity including BGY and HXF, and BGY and HXF have demonstrated a *de facto* independence from government control, we find that the AT&M single entity has demonstrated a *de facto* independence from government control with respect to its export activities.

Decision Mem. at 57.

In the first paragraph quoted above,  the Department describes its policy of examining "controls over the investment, pricing, and output decision-making process at the individual firm level . . . and not the activities of its owner, or its owner's parent company."  The court can agree that the "activities" of a parent company with no bearing on such individual firm matters may not be relevant, but the parent company's *control* or influence would seem entirely relevant.  More to the point, an exporter's attempted showing of *de facto* independence from government *qua* "government" is of dubious value if that exporter is not "*de facto*" independent from the influence

of its 100 percent PRC-government-owned parent company.  Yet the Department completely ignores this possibility, instead concluding that DSMC's evidence is immaterial because it does not concern "control [by] the PRC government at any level over the numerous individual export decisions of the AT&M single entity."  Decision Mem. at 56.

        As shown in the chart below, the Department's government control analysis is strictly limited to entities within the dotted line:



*See Affiliation Memo* at 6-9.

        The court is mystified by this approach.  First, the Department's refusal to make findings on the parent company, or for that matter, *any* PRC company, leaves unrebutted the

presumption that "all companies within the NME entity," including parent companies, "are subject to government control."

Second, the Department's position is inconsistent with its recognition even in this case that controlling shareholders present a significant potential for manipulation. Although controlling shareholders may be too remote to actually influence the first two questions in the *de facto* analysis, the last two factors are not easy questions. Can a subsidiary show independence from a majority shareholder on matters concerning management selection and the disposition of profits and assets? Evidence in this matter would seem to compel an answer in the negative. Article 38 of the Company Law requires shareholder approval of most major board decisions, including the allocation of profits. If it were determined that CISRI is the *only* ATM shareholder that may nominate candidates for the board of directors and holds [[   ]] percent of the voting shares, it would seem difficult to avoid the conclusion that CISRI controls the board as well as the shareholder vote.

The Department justifies its determination as comporting with its "long established" methodology. This is good news for the court, because long established methodologies typically generate a plethora of decisions applying and explaining that methodology, and greatly enhance the court's understanding of the questions involved. Unfortunately, the court's research reveals a paucity of separate rate determinations involving parent-subsidiary relationships, and in spite of the notation "*see e.g.*," in the first paragraph noted above, the cited decisions (*Cut to Length Steel Plate* and *Tapered Roller Bearings*) do not involve companies with parent-subsidiary relationships. The first part of the Department's stated investigational practice, which concerns firm-level decision

making, is stated in scores of decisions.  The second part, *i.e.*, "and not the activities of its owner or its owners' parent company," which is the focus here, is not.

Moreover, even where the "practice" is found, it is neither explained nor acknowledged as a practice.  In the one case cited by ATM that does involve a parent-subsidiary relationship analogous to the situation at bar, *Foundry Coke From the People's Republic of China*, 66 Fed Reg. 13885 (Mar. 8, 2001) (preliminary LTFV determination) (awarding separate rate to an exporter "majority owned by a company which is in turn owned by the government"), the Department therein never addresses shareholder control or offers any explanation for its decision beyond a boilerplate recitation of the *Silicon Carbide* test.  This is also the case in *Structural Steel Beams From the People's Republic of China*, 66 Fed. Reg. 67197, 67199 (Dec. 28, 2001) (preliminary LTFV determination) (awarding separate rate to a company that was 63 percent owned by a holding company wholly owned by a provincial governments because there was no evidence of *de facto* control) and *Synthetic Indigo from the People's Republic of China*, 65 Fed. Reg. 25706 (May 3, 2000) (final LTFV determination) (awarding separate rate when a state-owned enterprise held a minority interest in the company and appointed five of thirteen directors).  And in the final analysis, the decisions that truly "take the cake" in terms of  reasoning and support are the more recent determinations that cite *this case* as evidence of prior practice.  *See*, *e.g.*, *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China*, 73 Fed. Reg. 40485 (July 15, 2008) (final LTFV determination; stating in Issues and Decisions Memorandum at Comment 25 that "the mere existence of government-owned shares in the producer is not a basis for denying separate rate status . . .[t]he Department has previously granted separate rate status to . . . producers, like

GTC, whose stock was partially owned by a government state assets management company");

*Certain Cut-to-Length Carbon Steel Plate from the People's Republic of China*, 73 Fed. Reg.

67124 (Nov. 13, 2008) (new shipper preliminary review).

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837

(1984), requires deference to an agency's reasonable interpretation of an ambiguous statute it is

charged with administering, and such deference has previously applied to methodologies developed

by Commerce in antidumping duty contexts where no formal regulation was in place. *Pesquera*

*Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1382 (Fed. Cir. 2001). The court, however,

cannot decide reasonableness without the Department's full explanation of its practice, which is not

evident from this determination (or any other, for that matter). Accordingly, the court finds that

DSMC is entitled to relief in its challenge to the Department's separate rates determination.

*Conclusion*

Upon consideration of the arguments presented herein, it is hereby

**ORDERED** that ATM's USCIT Rule 56.2 Motion for Judgment upon the Agency
record challenging *Diamond Sawblades and Parts Thereof from the People's Republic of China*, 71
Fed. Reg. 29303 (May 22, 2006) ("*Final Determination*"), *as amended*, 71 Fed. Reg. 35864 (June
22, 2006) be, and it hereby is, DENIED in part with respect to its challenges to Commerce's zeroing
methodology and choice of surrogate financial data, and it is further

**ORDERED** that DSMC's 56.2 Motion for Judgment upon the Agency Record
challenging the *Final Determination*, be, and hereby is GRANTED in part with respect to
Commerce's separate rates analysis and DENIED in part with respect to Commerce's determination
on the country of origin of certain subject merchandise; it is further

**ORDERED** that the defendant's consent motion for reconsideration of the valuation
of steel inputs be, and hereby is GRANTED; it is further

**ORDERED** that the *Final Determination* (as amended) be, and hereby is, remanded
to the International Trade Administration, U.S. Department of Commerce ("Commerce") for

reconsideration and further explanation in accordance with this Opinion and Order and all applicable laws; it is further

      **ORDERED** that, on remand, Commerce must further explain why its analysis of government control does not consider shareholder control, and why it deviated from its original test set forth in *Cased Pencils*; it is further

      **ORDERED** that the parties provide comment (or indication of none) on the sufficiency of the information to be redacted from the confidential version of this Opinion (above indicated by double bracketing) to the Clerk of the Court within seven (7) days, and it is further

      **ORDERED** that Commerce shall file the results of its remand redetermination with the court within sixty (60) days from the date of this Opinion and Order, plaintiffs and defendant-intervenor shall file any comments thereon within thirty (30) days thereafter, and defendant shall file any response thereto within fifteen (15) days thereafter.

                      /s/  R. Kenton Musgrave
                      R. Kenton Musgrave, Senior Judge

Dated: October 12, 2011
      New York, New York