Slip Op. 12 - 147

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| ADVANCED TECHNOLOGY & MATERIALS CO., LTD., BEIJING GANG YAN DIAMOND PRODUCTS COMPANY, and GANG YAN DIAMOND PRODUCTS, INC., | : | |
| Plaintiffs, | : | Before: R. Kenton Musgrave, Senior Judge |
| BOSUN TOOLS GROUP CO. LTD, | : | Consol. Court No. 09-00511 |
| Plaintiff-Intervenor, | : | **PUBLIC VERSION** |
| v. | : | |
| UNITED STATES, | : | |
| Defendant, | : | |
| and | : | |
| DIAMOND SAWBLADES MANUFACTURERS COALITION, WEIHAI XIANGGUANG MECHANICAL INDUSTRIAL CO., LTD., and QINGDAO SHINHAN DIAMOND INDUSTRIAL. CO., LTD., | : | |
| Defendant-Intervenors. | : | |

## OPINION

[Remanding first results of remand of antidumping duty investigation of sales at less than fair value of diamond sawblades and parts thereof from the People's Republic of China.]

Dated: November 30, 2012

*Jeffery S. Neeley*, *Michael S. Holton* and *Stephen W. Brophy*, Barnes, Richardson & Colburn, of Washington DC, for the plaintiffs.

*Delisa M. Sanchez*, Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington DC, for the defendant. With her on the brief were *Stuart F. Delery*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Franklin E. White, Jr.*, Assistant Director. Of Counsel on the brief was *Nathaniel J. Halvorson*, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce.

*Daniel B. Pickard* and *Maureen E. Thorson*, Wiley Rein, LLP, of Washington DC, for defendant-intervenor Diamond Sawblades Manufacturers Coalition.

Musgrave, Senior Judge: This opinion considers the results of remand from the U.S. Department of Commerce, International Trade Administration ("Commerce" or "Department") on the investigation into sales from the People's Republic of China ("PRC") of diamond sawblades and parts thereof at less than fair value ("LTFV").[1] *See* Slip Op. 11-122 (Oct. 12, 2011), familiarity with which is presumed. The petitioners, Diamond Sawblades Manufacturers Coalition ("DSMC"), argue for further remand while the defendant and the three respondents comprising the "AT&M entity,"Advanced Technology & Materials, Co., Ltd. ("AT&M"), Beijing Gang Yan Diamond Products Company ("BGY") and Gang Yan Diamond Products, Inc., argue for sustenance.

The standard of review requires "substantial" evidence on the record, 19 U.S.C. § 1516a(b)(1)(B)(I), which assesses the reasonableness of the agency's determination. *E.g.*, *U.S. Steel Corp. v. United States,* 621 F.3d 1351, 1357 (Fed. Cir. 2010), citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951). *See* Charles H. Koch, Jr., 3 *Admin. L. & Prac.* § 9:24 (3d ed.) (the standard requires the "court to assure that there is a relatively high probability that the agency is correct"). A determination "of less than ideal clarity" may be sustained "if the agency's path may

---

[1] *Diamond Sawblades and Parts Thereof From the People's Republic of China*, 71 Fed. Reg. 29303 (May 22, 2006) (final LTFV determination) *"Final Determination"*), *as amended*, 71 Fed. Reg. 35864 (June 22, 2006). The period of investigation ("POI") is October 1, 2004, through March 31, 2005.

reasonably be discerned," but the determination is examined on that basis. *Bowman Transp. Inc. v.*

*Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 286 (1974). In other words, it will not be

sustained upon a "reasoned basis for the agency's action that the agency itself has not given[.]" *Id.*

at 285-86, referencing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). As explained below, the

remand results will be remanded for further analysis.

*"Separate Rate" Analysis of the AT&M Entity*

I. Background

Previously discussed, Commerce employs a rebuttable presumption of governmental

control over export operations in antidumping duty proceedings involving non-market economy

("NME") participants. *See, e.g., Bicycles from the People's Republic of China*, 61 Fed. Reg. 19026

(Apr. 30, 1996) (final LTFV determination). To obtain a "separate" antidumping duty rate, a

respondent must demonstrate that its export operations meet the three *de jure* and four *de facto*

factors comprising the separate rate test announced in *Sparklers from the People's Republic of*

*China*, 56 Fed. Reg. 20588 (May 6, 1991) (final LTFV determination), as modified by *Silicon*

*Carbide From the People's Republic of China*, 59 Fed. Reg. 22585 (May 2, 1994) (final LTFV

determination) ("*Silicon Carbide*"). *See* Import Administration Policy Bulletin 05.1 (Apr. 5, 2005).

The *de jure* factors are (1) an absence of restrictive stipulations associated with an individual

exporter's business and export licenses, (2) any legislative enactments decentralizing control of

companies, and (3) other formal measures by the government decentralizing control of companies.

The *de facto* factors typically considered are (1) the ability to set export prices independently of the

government and without the approval of a government authority, (2) the authority to negotiate and

sign contracts and other agreements, (3) the possession of autonomy from the government regarding the "selection" of management, and (4) the ability to retain the proceeds from sales and make independent decisions regarding the disposition of profits or financing of losses.

In answer to the question of how BGY sets its export prices, for the preliminary determination Commerce outlined that BGY certified in its August 25, 2005 questionnaire response that those prices are neither set by nor subject to the approval of a government agency, and that BGY had provided emails between its general manager and unaffiliated U.S. customers regarding price negotiation on U.S. sales as well as documents "demonstrating independent negotiation of contracts for purchases of raw materials" in addition to "documentation that both BGY and AT&M select their own management and boards of directors[.]" *Diamond Sawblades and Parts Thereof from the People's Republic of China*, 70 Fed. Reg. 77121, 77127 (Dec. 29, 2005) (*inter alia*, preliminary LTFV determination). The petitioners DSMC challenged this, arguing that the AT&M entity, through shareholding, is controlled by the Central Iron and Steel Research Institute ("CISRI"), which is owned by one of the PRC's state-owned assets supervision and administration commissions ("SASAC"). Nevertheless, Commerce preliminarily granted a separate rate because, "[a]lthough Petitioner has stated that SASAC has the authority to hire and fire management and order asset sales and acquisitions at CISRI, it has provided no evidence on the record of this proceeding that SASAC had the ability to exercise such control over AT&M and BGY during the POI." *Id.*

For the final determination, the DSMC (re)iterated that Commerce's finding was contrary to "Decree of the State Council of the People's Republic of China No. 378: Interim Regulations on Supervision and Management of State-owned Assets of Enterprises (2003)" ("Interim

Regulations" or "IR"), the PRC law governing state-owned enterprises, which DSMC contended *de jure* undermined BGY's independence under the Company Law.   Commerce's essential response was that it "has consistently found an absence of *de jure* control when a company's operations were governed by the Company Law of the PRC, and when it supplied business licenses and export licenses, each of which have been found to demonstrate an absence of restrictive stipulations and decentralization of control of the company." *Issues and Decision Memorandum for the Final Determination*, 71 ITADOC 29303 (May 15, 2006) (I&D Memo) (Comment 16).   Further explanation followed:

> The information submitted by Petitioner addresses a theoretical control by SASAC over CISRI, rather than any control of the PRC [G]overnment at any level over the numerous individual export decisions of the AT&M single entity that took place during the POI. BGY placed numerous documents on the record that were examined for the *Preliminary Determination*. . . .
>
> * * *
>
> . . . With respect to Petitioner's argument that the Department found at verification that four members of AT&M's board of directors are PRC [G]overnment officials, the Department notes that this is a misreading of the report which states merely that four members of AT&M's board were representatives of CISRI.  *See* BGY Verification Report, at 9.  Further, we note that these four individuals are a minority on the board of directors, of which two other members are representatives of AT&M, and three additional members are independently appointed by the stock exchange committee. *See id.*

*Id.*, referencing 70 Fed. Reg at 77126.

As part of this consolidated action, the DSCM's challenge to that determination was remanded to Commerce for clarification of the separate rate test in general and explanation of why Commerce essentially considered irrelevant the shareholder control over the AT&M entity that appeared traceable to the PRC Government, as argued by the DSMC.

## II. Summary of Remand Results

On remand, Commerce continues to conclude that the government-owned status of AT&M's majority shareholder, CISRI, does not affect determining that the AT&M entity is eligible for a separate rate, and it offers three broad reasons therefor. First, Commerce declares CISRI free of PRC control in its own right, *de jure*, by virtue of its corporate form, an "owned by all the people" company,[2] of the type Commerce has previously declared "insulated" from governmental control and to which state control has been "devolved," and therefore CISRI cannot "pass on" any governmental control to the AT&M entity through shareholding.

Second, Commerce finds the existence of legal "barriers" between PRC companies and their majority shareholders, such that even if CISRI is AT&M's majority shareholder, the AT&M entity is also free, *de jure*, of government control in its own right. The legal matter relied upon for this conclusion includes AT&M's articles of association, the "Company Law of the People's Republic of China (1999 Amended)" ("Company Law" or "CL") and the "Code of Governance for Listed Companies." Commerce notes the latter are among the PRC laws it has previously accepted as evidence of the "absence" of *de jure* governmental control over a company's export operations. Commerce acknowledges that AT&M's board of directors is responsible for

---

[2] Remand Results ("RR") at 3. Specifically, Commerce relied on CISRI's articles of association to find CISRI able to conduct its own business operations "without any level of input from the PRC Government or the SASAC," able to control its own profits, losses, capital and assets despite being fully financed by SASAC, able to "elect" its president at the employee representatives meeting "without input or influence from the PRC Government or SASAC," and able to permit the employees to "democratically elect[ ]" CISRI's management, "actively participate in decisions" concerning business operations "through a democratic process," and "retain[ ] control of its business operations." *Id.* at 3-4, referencing BGY's Sep. 20, 2005 Supp. Q. Resp. at Ex. 10-2 (CISRI's articles of incorporation).

selecting the general management including management over export operations and that only shareholders owning a certain minimum percentage of shares (*i.e.*, CISRI) are permitted to nominate candidates for board and management positions, but Commerce found that candidates nominated to the board require the unanimous votes of the shareholders in order to gain appointment and reasoned that the power of veto means CISRI does not "control" AT&M's board, as does the fact that CISRI's representatives on the board are a minority in number.

Third, with respect to *de facto* control over the AT&M entity, Commerce concludes that its absence was established in the original investigation as well as by (re)analysis on remand of copies of certain board resolutions documenting the voting and appointment of certain managers as well as certain financial statements and board meeting minutes at which all board members discussed and voted upon profit distribution. RR at 8, referencing BGY's Sep. 20, 2005 Supp. Q. Resp., at Ex. SA-22. Commerce thereby reiterates that the AT&M entity has demonstrated the absence of both *de jure* and *de facto* control regarding the selection of managers and the distribution of profits, and that DSMC's information, in particular the Interim Regulations, is insufficient to undermine the AT&M entity's entitlement to a separate rate.

### III. Discussion

The court cannot sustain the remand results on the bases articulated by Commerce. In particular, the court remains concerned that Commerce has failed to consider important aspects of the problem and offered explanations that run counter to the evidence before it. *See Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In other words, the thread of analysis pretty much begins where left off. *See* Slip Op. 11-022 at 26.

A. Commerce Policy re Ownership of
Separate Rate Applicant; Form of Owner

The court requested explanation of why CISRI is considered irrelevant to the separate

rate analysis. The stated answer is that "in keeping with precedent" CISRI was not required "to

address the separate-rate criteria because the separate rates test applies only to exporters." That may

be true, but it does not explain. There is no dispute that the focus of the separate rates test here is

the AT&M entity's export operations, that Commerce's test applies only to exporters, and that CISRI

is not an exporter, but CISRI is still an owner, and even the AT&M entity agrees consideration of

that ownership is relevant. *See* AT&M Comments at 5.

Commerce did analyze CISRI to some degree nonetheless, and it concluded the

corporeal form of CISRI effectively "insulated" CISRI from governmental control. As part of their

argument concerning governmental control of AT&M, the DSMC pointed to the fact that CISRI

defines itself as a "state-owned enterprise," however Commerce dismissed this point on remand as

mere "designation that does not restructure or reformulate the corporate form," and because after

promulgation of the Interim Regulations and the creation of the SASAC, CISRI did not file for a new

business license or restructure or reformulate its articles of association. *See* RR at 18-19. The retort

does not make sense. Commerce admits CISRI is a "state-owned enterprise," *see* RR at 20, and the

advent of the Interim Regulations and the creation of SASAC would not have resulted in changes

to CISRI's articles or license *unless* CISRI no longer intended to operate, *e.g.*, as state-owned.[3]

---

[3] *See Global Economic and Technological Change: Former Soviet Union and Eastern
Europe, and China*, S. Hrg. 102-586, Pt. 2, 129, 196 (Jun. 8 and Jul. 27, 1992) (*CIA Report on
China's Economy*) ("'State-owned enterprise' is a short-hand term for the Chinese designator
'enterprise under the ownership of all the people'"); *see also Silicon Carbide* (relying on said report).

As to "insulation" from governmental control, Commerce essentially appeals to its "long standing" position with respect to "owned by all the people" companies, which is that the PRC Government has "devolved" control to them, which therefore "*demonstrat[es]* that CISRI is insulated from government control . . . and thus [is] not in a position to exercise government control over ATM as one of its shareholders[.]" RR at 5-6 (italics added). This is faulty logic. Appeal to tradition may simply indicate ossification, undeserving of deference,[4] and, to the court's knowledge, corporate form in and of itself has never been found to "demonstrate" insulation from governmental control, or further *de jure* proof of the absence thereof in accordance with the separate rate test would serve no purpose. Commerce here runs the risk of being interpreted as effectively disavowing its own test, when the prior opinion only observed that "government ownership by itself is not dispositive" of the issue of governmental control. Slip Op. 11-122 at 14-15, quoting *Qingdao Taifa Group Co. v. United States*, 33 CIT ___, ___, 637 F. Supp. 2d 1231, 1242 (2009). As stated in Import Policy Bulletin 05.1, "the test focuses on controls over the decision-making process on export-related investment, pricing, and output decisions at the individual firm level;" thus, the precise inquiry is governmental involvement in "decision-making." The second of the *de jure* factors is "legislative enactments decentralizing control of companies." And owners, of course, may be "companies" -- with obvious interests in the "decision-making process" to which their investments are being put -- which naturally leads to the following.

---

[4] *See, e.g., Butterbaugh v. Department of Justice*, 336 F.3d 1332 (Fed. Cir. 2003) (any deference to "traditional" administrative interpretation owed under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) does not outweigh contrary conclusions drawn from certain statutory text); *see also United States v. Mead Corp.*, 533 U.S. 218, 247 (2001) (Scalia, J., dissenting). The court here could not previously discern Commerce's parent-subsidiary policy. *See* Slip Op. 11-122 at 24-26.

### B. Further Analysis of the Interim
### Regulations and Governmental Control

The circa-2003 creation of the SASACs and the Interim Regulations that intervened since issuance of *Silicon Carbide* are of some import to the matter at bar. As with other PRC laws and regulations, the Interim Regulations evince corporeal identification of "ownership" and "management" for all companies covered thereby. Those include state-owned enterprises, such as CISRI, and enterprises with state-owned equity, such as AT&M. *See* IR, Art. 2. The remand results' analysis of the Interim Regulations, however, raises more questions than answers as to the relevant distinctions of those concepts in the context of "governmental control" and this case.

Commerce maintains that the Interim Regulations changed nothing of relevance and that SASAC/CISRI essentially continue to act merely as passive owner/investors with respect to the AT&M entity.[5] Thus, Commerce concludes that "the Interim Regulations do not automatically demonstrate *de jure* control of a state-owned enterprise[,]" *id.* at 20, and that the Interim Regulations "set[ ] aside particular protections for the autonomy of companies operating under SASAC, showing that SASAC *solely* provides oversight and is not intended to *direct* day-to-day business operations" and does not "interfere [in] or influence" the latter. RR at 21 (italics added). The court fails to discern from the record why that is the case, as various provisions among the Interim Regulations directly conflict with these observations. The latter reasoning also rests on a slippery slope.

_____

[5] *See, e.g.*, RR at 12-14 & 20-21, referencing IR at Arts. 3 & 4. Commerce notes that the Interim Regulations provide for "separation of ownership from management." *Id.* at 21 quoting IR, Art. 7. Commerce further observed that "those companies operating under SASAC 'enjoy autonomy in their operation,' and that SASAC 'shall support the independent operation of enterprises according to law, and shall not interfere in their production and operation activities . . ..'" *Id.*, quoting IR, Art. 10. The DSMC justifiably criticize Commerce for omitting the remainder from Article 10: ". . . apart from performing the responsibilities of investor."

The Interim Regulations provide that SASAC's "invested enterprises shall accept the supervision and administration conducted by the State-owned assets and administration authority according to law[.]" IR, Art. 11.    This seems an obvious declaration of *re*-centralized *de jure* control, of "invested enterprises" including those that are wholly state-owned, such as CISRI, and those in which the state has an investment, such as AT&M. *See, e.g.*, IR, Art. 1. SASAC "is responsible for *directing* State-owned enterprises[,]" *id.*, Art. 20 (italics added). Further substantial evidence of record does not support the inference that SASAC's "management"[6] of its "state-owned assets" is restricted to the kind of passive-investor *de jure* "separation" that Commerce concludes.

For example, the Interim Regulations confer upon SASAC the authority to appoint or remove (including proposals therefor) "the responsible persons of its invested enterprises" including the general manager, deputy general manager, and/or chief accountant of SASAC's state-owned enterprises "in accordance with the relevant provisions." *See* IR, Arts. 13, 17. CISRI's February 23, 2000 articles of association state that to the extent they conflict with any PRC laws the

---

[6] By way of background, the Interim Regulations provides that SASAC "manages" the "state-owned assets of enterprises," and the "state-owned assets supervision and administration authority of the government at a higher level guides and supervises according to law the management work of state-owned assets supervision and administration of the government at a lower level." IR, Art. 12. The main responsibilities of a state-owned assets supervision and administration authority include performing "the responsibilities of investor for the invested enterprises" in accordance with the Company Law and other related laws and regulations and dispatching "supervisory panels to the invested enterprises," in addition to "appoint[ing] or remov[ing] the responsible persons of the invested enterprises[.]" IR, Art. 13. Article 14 states that SASAC shall "respect and safeguard the operational autonomy of State-owned enterprises and State-owned holding enterprises" but also obliges SASAC to more nebulous activity, such as "explore effective systems and ways for the management of State-owned assets of enterprises, enhance the work of supervision and management of State-owned assets of enterprises," "improve corporate governance, and advance the modernization of management," impel enterprises to "operate and manage according to law" *et cetera*. Article 15 states that SASAC "shall report to the government at the corresponding level about the supervision and management work of State-owned assets of enterprises." *Cf.* IR, Art. 12.

latter control. Thus, the DSMC were correct in pointing out that conflicting provisions in CISRI's

articles of association were abrogated upon promulgation of the Interim Regulations, at which point

SASAC had the right, *de jure*, to appoint/remove members of CISRI's board and management during

the POI despite the "democratic" election of CISRI's president stated in its articles of association.

Further, "in accordance with the Company Law" SASAC has the authority to

nominate candidates "for the director of the board or supervisor to be dispatched" to a company with

state-owned equity such as AT&M[7] and instruct those directors/representatives to exercise voting

rights in accordance with SASAC's instructions, *id.*, Art. 22. "Voting rights" are made explicit with

respect to "major matters" (*e.g.*, division, merger, bankruptcy), but the authority of a *director* who

also happens to represent the state's interests is broader. As Commerce is aware, those duties

explicitly encompass, *e.g.*, implementation of shareholder resolutions, deciding the company's

operational and investment plans, formulating annual budgets and plans for profit distribution and

recovery of losses, appointing or dismissing the company's general manager, *et cetera*. *Cf.* Company

Law, Art. 46. Also, Commerce recognizes that the board of directors of AT&M "is in charge of

overseeing . . . business matters[.]" RR at 19. That recognition is in direct contrast to Commerce's

declared position, from its analysis of *de jure* "control" in the Interim Regulations, *supra*, that a

director under SASAC/CISRI's dispatch is effectively absolved of responsibility for "directing."

Further, the exclusion of "day to day operations" from "oversight" responsibility is a straw man.

---

[7] *Cf.* IR, Arts. 11, 12, 17. Commerce regards Article 17 as "limited to those companies that are deemed 'invested enterprises" and thus "CISRI's majority ownership in ATM is not a vehicle by which SASAC or the PRC [G]overnment can exercise control over the ATM Entity's export activities," RR at 21, but that is a misreading. Commerce acknowledges CISRI is fully financed by SASAC, RR at 4-5, CISRI's investment in AT&M is an "asset" of a state-owned enterprise, IR, Art. 3, and as mentioned, SASAC/CISRI owns "state-owned equity" in AT&M. *See id.*, Art. 4.

Commerce's analytical assumptions are not based on common or business sense. They are particularly conspicuous when confronting the *de jure* possibility of a general manager appointed by a board under SASAC's effective control, as permitted (or declared) by the Interim Regulations. Commerce acknowledges from CISRI's articles of association that CISRI's president is "responsible for" business operations including any investment-related export operations (*e.g.*, CISRI's investment in the AT&M entity) in addition to production, research and development, and "human resources," and Commerce is also aware that CISRI, or possibly SASAC, dispatched at least four individuals, *de facto*, to AT&M's board and management. The record further shows two members of AT&M's management on the board including its chief executive officer, which opens up the possibility of subjugation, as well as three "independent" board members who appear to be directly answerable to another PRC Government agency apart from SASAC. *See infra.* Commerce's interpretation of the Interim Regulations, however, prevented it from acknowledging a *de jure* prospect of "governmental control" of AT&M or determining the full *de facto* actuality of CISRI's and AT&M's management -- by whom and how selected, nominated, dispatched, to whom answerable, and so forth -- in addition to approval or confirmation by board resolution.[8]

Commerce's last references to the Interim Regulations are to Article 27, which provides that "state-owned enterprises are able to enjoy the rights of an investor in those companies in which they hold shares, consistent with the Company Law," and which Commerce concludes means "CISRI's independence from the government with regard to its decisions as an AT&M

---

[8] *Cf.* Verification Report at 11 (providing cursory description(s) of management approval process). In that regard, it might not be unreasonable to deem such consideration unnecessary, *a fortiori*, if the only reasonable interpretation of the record on the issue of governmental control of AT&M's board is that only CISRI is relevant and only has "minority" power thereat and there is no other evidence of "governmental control," but those assumptions require re-examination. *See infra.*

investor are protected by the Company Law from any government interference," and to Article 42, which provides that "organizational form, organizational structure, rights and obligations . . . shall be governed by the Company Law," and which Commerce declares it "has previously found to demonstrate the absence of *de jure* control." RR at 22. The court does not understand these points. Even if CISRI had obtained State Council approval as required by Article 27 to act as an investment company, holding company or investment institution, either in general or with specific respect to its state-owned equity in AT&M, *see* IR, Art. 27, *see also id.* at 12 & 20, it remains the case that SASAC is CISRI's sole owner and enjoys all of the rights over CISRI and over CISRI's investment in AT&M that inhere in shareholders under the Company Law -- which, in and of itself, is not demonstrative on the issue of *de jure* governmental control.

      The Company Law rather appears neutral on that issue. As the DSMC point out, previous findings of the "absence" of *de jure* governmental control are mainly due to the significant rights the Company Law provides to *investors*, including the right to "enjoy the benefits of assets of the company, make major decisions, choose managers, *et cetera*, in accordance with the amount of capital they have invested in the company." *See* CL, Art. 4; *see, e.g., Certain Cased Pencils From the People's Republic of China*, 59 Fed. Reg. 55625, 55628 (Nov. 8, 1994) (final LTFV determination) (finding significant the percentage of private individual shareholdings of respondent). In other words, where the government or its agency is the controlling investor, *de facto*, the Company Law does not *free* the investee from governmental control, it is being used to *subject* the investee to governmental control -- with or without (but especially given) the Interim Regulations. *See* DSMC Comments at 18. Indeed, Commerce admits as much, having in other instances looked to whether the government has exercised its *de jure* control *de facto*. *See Qingdao Taifa Group*,

*supra*, 33 CIT at ___, 637 F. Supp. 2d at 1243 and determinations cited. That amounts to conflation

of the *de jure* and *de facto* analyses, but here, at least, the court can agree Commerce's statement that

the Company Law has been "found to demonstrate an absence of *de jure* control," *e.g.* RR at 22, is

inadequate consideration of the DSMC's proposition, and it lacks, as above opined, common

business sense.[9]

---

[9] Commerce appears to acknowledge much of the foregoing when it recast the DSMC's arguments in the original determination and on remand, *see*, *e.g.*, RR at 12-14, but Commerce's response seems based on numerous red herrings, such as the fact that minority shareholders have certain rights, *et cetera*. Rejecting all such fallacious argument, the court remains unclear as to what this all means in the larger context of Commerce's separate rate policy. For example, notwithstanding provisional reference in the Interim Regulations to corporeal "autonomy," *supra*, if SASAC is permitted to appoint and dispatch a "responsible person" pursuant to Articles 13 and 17 and directors pursuant to Article 22, then where is the bright-line "separation" of ownership and management that Commerce apparently perceives in such a circumstance? And what, if any, "interference" is there in action undertaken by such individual, once seated to such position, in the sense contemplated by Article 10 of the Interim Regulations, or Article 21 of the Corporate Governance Code to the same effect? Or, similarly, where is the "subordination relationship" ostensibly precluded by Article 26 of the Corporate Governance Code? *See also* note 10, *infra*. To the extent such person embodies SASAC's policies, objectives, and/or directives, how can the company's "independent" operation or interest be discerned, or has it rather been subsumed? As mentioned above, Commerce concluded that "SASAC *solely* provides oversight and is not intended to *direct* day-to-day business operation" (italics added), but how can that be the case if any SASAC-appointed/nominated "responsible person" or director or even manager within SASAC's "invested enterprises" (including "a company with State-owned equity," *i.e.*, AT&M) has had a hand or vote that results in "guiding" or "supervising" or "overseeing" any of such enterprise's operational activities including its export activities? That is, where does "oversight" end and "day-to-day business operation" begin, or does the exception swallow the rule? And notwithstanding whether a controlling shareholder's board nominees are a minority of the board, based on whatever numerosity, if other board members also hold managerial offices within the company, then why does that not present a potential problem of subjugation that should be examined? To whom are such persons and controlling shareholder nominees answerable? And lest Commerce simply presume such persons to wear the kind of "separate hat" described in *United States v. Bestfoods*, 524 U.S. 51, 69 (1998), why would it be appropriate to project the operation of *U.S.* law onto the managerial operation of *PRC* companies, and how would that square with the presumption of state control that is supposed to be the context of the separate rate test in the first place? On the other hand, given the imprecise treatment of the issue thus far, and begging the parties' indulgence, at this point the court has little confidence these are even the right questions to ask in moving towards proper disposition of this matter.

### C. Further Analysis of the Company Law

Commerce's analysis of the Company Law adds little to assuage the *de jure* issue of governmental control of a company through ownership. Commerce notes that Articles 16 and 20 of the Company Law allow state-owned enterprises to invest of their own accord in limited liability companies which, according to Commerce, ensures that the company will continue to operate under a "democratic management structure." RR at 23 (citation omitted). *See also* note 2. But, Article 20 simply provides in relevant part that "a state-authorized investment institution or a department authorized by the state may invest on its own to establish a wholly state-owned limited liability company." CL, Art. 20; *see also* RR at 23. On its face, this provision preserves state shareholding power by allocating state institutions, with appropriate governmental deputization, to create wholly state-owned companies in which the state's shareholding power is undiluted. It does not appear that this may reasonably be construed to "limit" the power of the state in the companies in which the state invests. Further, Commerce does not explain the significance of "ensure . . . a democratic management structure" or why such a "structure," *per se*, would be detached from governmental involvement. In the absence of clarity in the context of the separate rate test, this seems gratuitous.

Article 38 of the Company Law, which is implicated by the Interim Regulations, "delimits," according to Commerce, the exact powers that shareholders can hold. Commerce implies these are limited to "high level" powers only, such as the appointment of the board of directors, establishing the articles of association, and approving various financial decisions such as profit distribution and budget plans that are established by the board of directors. Commerce omits the ability "to decide on the company's operational policies and investment plans," but be that as it may,

the court remains unclear why Commerce has concluded, in effect, that the Company Law restricts the PRC Government from implementation of its own Interim Regulations and from becoming a company's controlling shareholder and acting in furtherance of such control of the company.

After analyzing various other provisions that basically support identification of limited liability companies as legal entities, Commerce concludes that "the Company Law *separates* the powers between the shareholders and the Board of Directors, where the primary purpose of the Board of Directors is to design plans related to business functions and to enact them as they are approved by the shareholders," and that Article 50 "provides for another degree of *separation*" by concentrating certain powers in the hands of a general manager. *Id.* (italics added). Once again, it is unclear what significance Commerce draws from this. The concern here is not over directorial liability,[10] and none of the points undermines or addresses the fact of CISRI as AT&M's controlling shareholder, or indicates that the operation of the board and general manager are "insulated" from the shareholders to the extent Commerce implies, or addresses in any way the fact that "shareholders representatives" may be, and often are, sitting as directors on the board itself.

Article 37 of the Company Law makes clear that the general meeting of all shareholders is the supreme organ of the company, as numerous legal commentators have noted. The boards of PRC limited liability companies are "responsible to the shareholders" pursuant to Articles 37 and 46. Shareholders have the ability to hire and fire each board member and decide their pay

---

[10] *But cf.* IR, Art. 38 ("Where, in violation of the relevant provisions, the State-owned assets supervision and administration authority . . . illegally interferes in the production and operation of the invested enterprises . . ." *et cetera*). Given that SASAC seems to have the authority to appoint or nominate a general manager in charge of operations, is the "illegal interference" of that provisional context rather with respect to any *SASAC* objective for production and operation?

pursuant to Article 38, and each board member is thereby beholden. That amounts to delegation, as opposed to separation,[11] as does Article 50, since the general manager, in point of fact, is selected by the same board of directors "in charge of overall business planning and the selection of upper management" that is "responsible to the shareholders" and can readily be replaced at their whim. CL, Arts. 38, 50.

The point here is that "governmental control" in the context of the separate rate test appears to be a fuzzy concept, at least to this court, since a "degree" of it can obviously be traced from the controlling shareholder, to the board, to the general manager, and so on along the chain to "day-to-day decisions of export operations," including terms, financing, and inputs into finished product for export. The other provisions of the Company Law generally cited by Commerce do not implicate shareholders in any clear way, or clarify why Commerce regards ownership and management as "separated" by the equivalent of a Great Wall, or what this all signifies, and its reading of general, hortatory language as limiting is perplexing. *See* RR at 22-23. For example, it is unclear why Commerce has determined that Article 6, which states that "a company implements an internal management structure," acts to "limit" the power of shareholders, in particular controlling shareholders, to influence that implementation or structure or what this implies. *See id.* at 23. To summarize: given that the separate rate test factors are not facially restricted to obvious "direct" control of export pricing, *e.g.*, via export licensing, the court, as mentioned, continues to be mystified

---

[11] Taken as a whole, the PRC perspective of corporate ownership and management could be construed as rather in line with the general Anglo-Saxon jurisprudential view of corporations until the end of the 19th century, *i.e.*, that the board of directors is merely an agent of the company and its shareholders and serving at their pleasure. *See, e.g., Isle of Wight Railway Co. v Tahourdin*, (1884) LR 25 Ch D 320.

as to why Commerce reflexively interprets the Company Law to *preclude* the PRC Government, *de jure*, from lawful control, *de facto*, through ownership of a company including its export operations. Repetition, to the point of mantra, that the Company Law "establishes an absence of *de jure* control," *et cetera* (*see* RR *passim*), does not transform incomplete analysis or *ipse dixit* conclusion.

### D.  Further Analysis of the Code of Corporate Governance

Commerce's analysis of the Code of Corporate Governance ("Code") also does not enlighten.  The Code applies only to stock market listed companies such as AT&M, and Commerce cites it mainly for the proposition that majority shareholders' powers in the companies in which they invest are particularly limited.  But, Commerce reading of certain provisions goes beyond their text and without explanation for broad interpretation.  For example, a provision Commerce cites as protecting "the rights of all shareholders, including minority shareholders" contains the caveat that minority shareholders' rights and duties are "based on the shares that they hold."  *Compare* RR at 24 *with* Code, Art. 2.  And a provision Commerce cites as requiring complete separation between a listed company's personnel and its controlling shareholder in fact provides for listed company personnel to act as directors of the majority shareholder and *vice versa*.  *Compare* RR at 24 *with* Code, Art. 23.  The court fails to understand how Commerce interprets these provisions to curtail in any manner a controlling shareholder's *de jure* control of a company.

Commerce also relies on Article 20 of the Code for the proposition that "majority shareholders must consult with all shareholders to appoint senior management."  RR at 24.  Article 20 actually states that "controlling shareholders are forbidden to appoint senior management by circumventing the shareholders' meetings or the board of directors."  Apart from the fact that this

provision conflicts with Commerce's reading of the Company Law and AT&M's articles of association, pursuant to which management is not appointed by the shareholders at all but by the directors, *compare* RR at 24 *with id.* at 23, it is unclear how Commerce reads Article 20 as effectively limiting the controlling shareholder's powers when, for example, the controlling shareholder could simply call[12] a shareholders meeting to comply with relevant provision(s).

Elsewhere, Commerce attempts to bolster its decision by citing Articles 22-27 of the Code as further confirming the independence of listed companies from their majority shareholders and further confirming AT&M's autonomy from CISRI.  RR at 24-25.  Articles 22 and 23, for example, state that a listed company (such as AT&M) shall be "separate" and "independent" from controlling shareholders in such aspects as personnel, assets, and financial affairs.  But those concepts are not in a vacuum: when read as a whole, Articles 22-27 rather intend protections for minority shareholders by forbidding controlling shareholders from absconding with listed company assets, using listed company personnel to further the shareholders' own independent businesses, or engaging in business that competes with the listed companies' business, and such economic and fiduciary protections for minority shareholders do not appear to indicate why AT&M, *de jure*, is "independent" of its state-owned majority shareholder, which has the ability to nominate, hire or fire

---

[12] Moreover, it has been observed elsewhere that in practice the voting power of shareholders in PRC company shareholders' meetings is usually exercised by so-called "shareholders' representatives," who, for the controlling shareholder(s), is/are usually one or more of the directors of the company, so in such cases, when the board of directors signs its resolution and submits it to the shareholders' meeting for approval, the resolution has already been "approved" by the shareholders' meeting, since the controlling shareholder representatives/directors have already signed the resolution. *See, e.g., Foreign Direct Investments in China -- Practical Problems of Complying with China's Company Law and Laws for Foreign-Invested Enterprises*, 20 NW. J. Int'l L. & Bus. 475, 486-87 (2000).

its directors, decide on profit allocations, *et cetera*. They thus reveal little to an inquiry into "governmental control" in the running of a company including its export operations.

### E. Further Analysis of the AT&M Entity

The court also fails to understand from the evidence of record that AT&M's articles of association, the Code, and the Company Law create legal "barriers" separating AT&M and CISRI as concluded by Commerce. In addition to its analysis above, Commerce states that AT&M's articles require that nominees for the board of directors "may not be shareholders" and implies that shareholders are not permitted to be directors. *See* RR at 19. But, AT&M's articles of association only state that directors "need not be shareholders of the company."[13] That is not a barrier. Given CISRI's majority stake, this article rather appears to confirm CISRI's lawful control of AT&M's board. Commerce also finds significant that AT&M's "Board of Directors operates independently of the shareholders and is in charge of overseeing the business matters of the company," RR at 19, but, once again, even to the extent this *de jure* declaration is true, it is no indication of a controlling shareholder's *de jure* and *de facto* ability to "control" the board of directors and the company itself.

Ultimately, Commerce finds that AT&M is not "controlled" by CISRI because there are numerous other AT&M shareholders who all have "protected rights" as minority shareholders including voting rights. But facts drive the law, not *vice versa*. AT&M *itself* identifies its

---

[13] BGY's Sep. 20, 2005 Supp. Q. Resp. at Ex. SA-10(1) (AT&M articles of association), Art. 96. *See also id.* at Art 29 (requiring directors to "regularly declare the number of shares he possesses"). And if the term had been "may not" instead of "need not," would that prohibit the appointment of "shareholder representatives" or other agents from becoming directors?

"controlling shareholder" as CISRI in its financial statements,[14] and the power to veto nomination

does not equilibrate the power of control *over* nomination.[15]  *See, e.g., Metropolitan Washington*

*Airports Authority v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 268-70 & n.15

(1991) (appointments under Transfer Act "*must*" be made be made from the lists submitted by the

Speaker of the House; therefore, whether plaintiff has formal statutory power of appointment and

removal over board of review is irrelevant) (italics in original); *Biloxi Regional Medical Center v.*

*Bowen*, 835 F.2d 345, 352 (D.C. Cir. 1987) (any influence the "City" might exert through mayoral

veto power "falls well short" of establishing "control" under 42 C.F.R. § 405.427(b)(3)).

      Curiously, Commerce acknowledges as part of its *de jure* analysis that "the Interim

Regulations provide that SASAC may intervene in certain business operations" but then it "notes

that there is no record evidence that SASAC acted upon this power and intervened in the selection

of management and board members."  RR at 21.  Apart from this further conflation of *de facto* and

*de jure* analysis and evisceration of the presumption of state control in "the selection of . . .

management," *et cetera*, the administrative proceeding does not appear to have advanced to such a

---

[14] *See, e.g.*, BGY Section A Comments at Ex. 7; Letter to Sec'y of Comm. from Greenberg, Traurig, re: *Diamond Sawblades and Parts Thereof from China: Supplemental Questionnaire Response* at Ex. 4, p. 19 (notes to 2004 financial reports, sec. VI) (Dec. 5, 2005).

[15] Furthermore, under Article 66 of AT&M's articles of association, only "eligible shareholders" -- whatever that means -- in addition to members of the board are permitted to "collect voting power." Given that the presumption is of state control, in the absence of proof to the contrary (and the court's review of the record did not reveal proof to the contrary) whoever is elected to the board will necessarily have received CISRI's approval for nomination. AT&M's board cannot "lawfully" act otherwise, *see* AT&M Art. of Assoc. 130, and this circumstance necessarily counters any inference of minority "control" that might otherwise be drawn from the requirement of unanimous voting, but if unanimity is still relevant, it may also be of some significance that voting is not anonymous at AT&M, *id.* Art. 83, although the remands results do not discuss this.

state that the onus had shifted to the DSMC on that burden.[16]  *Cf.*, *e.g.*, *Certain Paper Clips From the People's Republic of China*, 59 Fed. Reg. 51168, 51170 (Oct. 7, 1994) (final LTFV determination) (management nomination meeting minutes, appointment announcements and correspondence between respondent and state established that state involvement in respondent's management appointment process "reflects nothing more than an administrative formality").

Apart from *de jure* control, the overriding question is whether there is *de facto* governmental control over export operations.  As above indicated, Commerce recognizes that scrutiny of board and management is critical to that inquiry.  In the original final results and on remand, Commerce found four of the nine AT&M directors representatives of CISRI.  One of those is AT&M's chairman of the board.  Commerce also found five directors not "involved in CISRI's business functions in any way" during the POI.  The record excerpts provided by the parties, however, do not evince information that would permit construal to the extent of the latter.[17]

---

[16]  As argued by the DSMC, albeit in the context of the absence of record information showing how CISRI's board members or managers were actually selected during the POI:

> In a situation in which the burden of proof is upon respondent to show a lack of state control (or, in this case, upon the agency to demonstrate that its determination of no state control is reasonable) a lack of record information regarding control cannot logically be adduced to show that the presumption has been rebutted.

DSMC Comments at 16-17.  At this point it would also seem appropriate to note the original determination's criticism, *supra*: "The information submitted by Petitioners addresses a theoretical control by SASAC over CISRI, rather than any control over the PRC Government at any level over the numerous individual export decisions of the AT&M entity that took place during the POI." I&D Memo at Comment 16(C).  The statement's first part is precisely what *de jure* analysis is all about -- *theory*, of *meaning* -- and the second part is precisely of which the DSMC complain -- burden-shifting.

[17]  The remand results reference Exhibit SA-11 of BGY's supplemental questionnaire response dated September 20, 2005 as support for the assertion, which concerns "Ownership of AT&M" and reveals nothing of significance regarding board membership, although the record also contains the verification report for AT&M and BGY.

The verification report for AT&M notes that two of the "non-CISRI" directors consisted of AT&M management, including the company's chief executive officer. Verification Report at 9 (Mar. 26, 2006). The DSMC argue the verification report actually proves at least one of those is also connected to CISRI *See, e.g.,* DSMC Comments n.2. The report also notes that the three other "non-CISRI" directors are "independent," in that they are "subject to approval by the independent stock exchange committee which will establish their independence." The remand results, however, do not delve into detail and thus do not resolve whether any of such individuals embody "governmental control."

Commerce's analysis of AT&M's board focuses only on CISRI's ability to control it. *See* RR at 19. If the proper analysis concerns "governmental control" of AT&M's board, it is unclear from this last statement or from the report itself whether the three "independent" directors are free of such governmental control *in toto*. *Cf.* Verification Report at 8 ("companies' conduct is supervised by the independent China Stock Exchange Committee"). BGY declared that none of its board members are "employed by" the PRC Government and it further declared that none of the AT&M entity companies are affiliated, owned, or controlled by "individuals employed by" the PRC Government, BGY's Sep. 20, 2005 Supp. Q. Resp. at 2, 6, 8, but apart from this and the statements of company officials at verification, the court does not discern corroboration of "independence" from "governmental control" of the five "non-CISRI" directors. Their independence seems assumed.

Regarding the two directors who are also members of AT&M management, the DSMC also raise a second legitimate concern. In their managerial capacity, those AT&M members appear on the record, *de facto* as well as *de jure*, to be beholden to the board that controls their pay,

in particular to the chairman of the board as the *de facto* company head under the PRC model.  If board members are properly presumed subject to governmental control, directly or indirectly, then true independence and autonomy remain in doubt until proven otherwise.  If they are not so presumed, then the presumption of state control is without purpose or application.  Examination of subjugation, therefore, ought to have been a necessary extension of any inquiry into "governmental control," a question not to be conflated with any *de jure* directorial obligations.  *Cf.*, *e.g.*, Code, Art. 23 ("[a] listed company shall be separated from its controlling shareholders in such aspects as personnel") *with* Art.33 ("[d]irectors shall faithfully, honestly and diligently perform their duties for the best interests of the company and all the shareholders").

It may well be the case that there is evidence of record from which these five directors true independence from governmental control may reasonably be concluded, but the remand results, arguments, and record excerpts provided by the parties do not appear conclusive to this point.  The court was tempted to revive and grant, *sua sponte*, DSMC's motion for oral argument, as the parties might be able to provide assistance, but in view of the resources this would have consumed and the fact that remand is required on other ground, the court considers that such questions are better left for Commerce and the parties to address on remand.

### F.  Further Defendant Commentary

The defendant would here disagree, with all of the foregoing, in arguing that the separate rate analysis is not simply a "litmus test for government influence in general" but is rather a "particularized analysis" of a company's export activities.  The separate rate test purports to "focus[ ] on *controls* over the decision-making process on export-related investment, pricing, and

output decisions at the individual firm level," Import Policy Bulletin 05.1 (italics added), and the defendant argues this means an examination of the "degree" to which those activities are "controlled" by a government or by the company itself. Def's Resp. at 6. The test "does not purport to ensure that no government interests are promoted through the exporter's business venture, but rather serves to ensure that the Government of China *itself* is not controlling the day-to-day export activities of the exporter in question." *Id.* at 6-7 (italics added).

Unfortunately, this does not clarify. The Interim Regulations, for example, provide for more than mere "influence in general." *See supra*. Nonetheless, the defendant argues that when all is said and done, the question is simply concerned with price variability: is the price of the diamond sawblades that AT&M exports to the United States "set by" the PRC Government or by AT&M; in other words, "does the price of AT&M's diamond sawblades exports to the United States by AT&M vary depending on world market conditions or is the price set and orchestrated by the PRC Government and only responds to changes ordered by the central government?" Def's Resp. at 11. But this too does not clarify, as those concepts are not mutually exclusive. The price of an arm's length transaction to a buyer in the market is always a "market" transaction by definition, and regardless of any "setting" of or involvement in price by the seller's government. *See, e.g.,* Case C-337/09, Judgment of the Court, ¶ 86 (Grand Chamber, European Court of Justice) (July 19, 2012).[18] For that matter, the actual setting of price is only one of the four *de facto* factors described in the Policy Bulletin, whereas governmental manipulation of the cost of inputs, *see id.,* or

---

[18] Available at http://curia.europa.eu/juris/document/document.jsf?text=&docid=125218&pageIndex=0&doclang=EN&mode=lst&dir=&occ=first&part=1&cid=375494 (last visited this date).

rationalization of industry or output are among numerous other scenarios of concern that can affect
seller pricing.

   In the end, the defendant concludes: "[b]ecause there is no record evidence indicating
that the [PRC] Government . . . sets the price of the diamond sawblades exported by AT&M,
Commerce correctly assigned AT&M a separate rate." Given the presumption of state control,
however, the reviewing standard requires record evidence that the PRC Government (including any
agent thereof) did *not* "set" (however defined) the price of diamond sawblades exported by AT&M.
That still remains in doubt. The obvious instance of governmental control of price setting would
be direct regulatory approval of a particular export price, but to what extent does the inquiry also
concern governmental "influence" in what might otherwise appear to be the company's decision?
The court cannot agree that is irrelevant. The question to Commerce might thus be better phrased
as follows: what is the agency's definition of the "degree"of"governmental control" in the "setting"
of export prices that must *not* be shown in order for an applicant to receive a separate rate, and where
is the line drawn to exclude or include implementation of governmental influence or policy? After
all, personnel is policy: it is axiomatic that inert entities (*e.g.*, corporations, governments) can only
*act* through agency,[19] concerning which "state" of affairs even socialistic European cousins recently
expressed a certain misgiving (without irony):

> [I]n the context of a non-market economy country, the fact that a company
> established in that country is *de facto* controlled by State shareholders raises serious
> doubts as to whether the company's management is sufficiently independent of the
> State to be able to take decisions regarding prices, costs and inputs autonomously and
> in response to market signals.

---

[19] Louis XIV cut to the chase: "*l'Etat, c'est moi.*"

*Id.*

For the above reasons, the court remains unclear as to the extent of "governmental control" that would preclude, or lack thereof permit, the grant of a separate rate, particularly with regard to the third and fourth *de facto* factors, as previously pondered. *See* Slip Op. 11-122 at 24. Specifically, it is unclear what the defendant means by "degree" or what Commerce means by "control," "separate," "autonomy," "independent," and so forth in the context of the separate rate policy, and one that lacks clarity in purpose or application borders on arbitrary and capricious. Whatever "degree" that is, Commerce's use of such terms to describe ownership and management in the context of this matter leads to confusion,[20] but it is at least clear that apart from the camel's nose of "guidance" or "oversight," Commerce concludes there is *no* degree of "control" or influence whatsoever by SASAC over CISRI or AT&M or by CISRI over AT&M, and that appears to be based on flawed analysis. The court must therefore await Commerce's reasonable explanation and analysis of "controls over the decision-making process on export-related investment, pricing, and output decisions at the individual firm level," as previously requested. *See* Import Policy Bulletin 05.1.

---

[20] For example, in addition to the foregoing, the finding that shareholders *lack* control over the board concerning their decisions including selection of management and distribution of profits appears to conflict with the finding that shareholders *have* control over the board in the form of veto power over CISRI's nominations thereto. For that matter, the remand results also give no indication that any *de jure* provisions permitting boards that include "shareholders representatives" were considered. *Cf.* note 12, *supra*.

### G. Further Analysis of Governmental
### Control Over AT&M's Finances

The DSMC also argue the evidence in support of AT&M's right to distribute its profits without government interference is similarly lacking. RR at 8; *see also* BGY's Sep. 20, 2005 Supp. Q. Resp. at Ex. SA-5. The court agrees in part. The evidence includes the records of a board meeting at which all discussions of profit distribution were explicitly accompanied by the caveat: "This resolution should be approved by the Shareholder's Meeting." *Id.* AT&M's controlling shareholder was CISRI, and shareholders' voting power is in proportion to their shares. *See id* at Ex. SA-10(1), Art. 35 & Ex. SA-11; *see also* BGY Section A Comments at Ex. 7. The DSMC are correct in pointing out that CISRI had the power over any profit distribution regardless of what the board of directors decided. However, the defendant is also correct in pointing out that CISRI's portion of AT&M's allocated profits is consistent with CISRI's role as a shareholder entitled to a proportionate share of the profits.

On the other hand, the defendant argues too narrowly that this "does not suggest or establish government control upon AT&M's export activities, nor did Commerce's review of the board minutes from the relevant AT&M's board meeting suggest any government control over export activities. Remand Redetermination at 8. The DSMC's larger point here is that the financial statements to which Commerce cites are only balance sheets, without auditor's notes or other detail, *cf.* RR at 8 *with* BGY's Sep. 20, 2005 Supp. Q. Resp. at Ex. SA-22, and more complete versions that AT&M submitted in a later response clarify that CISRI had significant [[

]]. *See* BGY's Dec. 5, 2005 Supp. Q. Resp. at Ex. 4, p.48 (Notes to Main Items of Parent Company Financial Report at Item 23); *see also id.* at Ex. 2 (Footnotes, Section V.27 and

XI.3). The DSMC thus contend this indicates AT&M's [[

]]. *See*

*id.* at Ex. 4, p.48; *id.* at Ex. 2 (Footnotes, Section V.27 and XI.3). *Cf.* Import Policy Bulletin 05.1

("the test focuses on controls over the decision-making process on export-related *investment*" *et*

*cetera*) (citations omitted; italics added). That, of course, implicates profits and losses, because

money is fungible. Therefore, in addition to the foregoing, Commerce will consider (or reconsider)

and address the DSMC's specific concerns on these points on remand, bearing in mind the

presumption of state control.[21]

---

[21] In passing, the court also notes that in response to Slip Op. 11-122, Commerce distinguished the separate rates test as "unlike" the affiliation/collapsing test on the ground that the latter is premised on shareholders' ability to control a respondent's *future* acts, whereas the separate rates test is focused on evidence of control being exercised on *current* acts during the period of investigation or review. RR at 17-18 (the separate rate test "then prospectively applies to the results of this analysis until the next review period"). The DSMC point out that Commerce in 1997 explained that the purpose of the separate rates test is to "prevent an NME government from *later* circumventing an antidumping order by controlling the flow of subject merchandise through exporters which have the lowest margin[,]" which is clearly an implication of future behavior. *See Certain Cut-to-Length Carbon Steel Plate From Ukraine*, 62 Fed. Reg. 61754, 61757-60 (Dep't Commerce Nov. 19, 1997) (final determination of sales at less than fair value) (italics added). Furthermore, the DSMC contend, if the current results are allowed to stand, there will be no future review period since the results are *de minimis*. AT&M comments that the policy bulletin "made even more apparent" that it is not the ability to shift sales among companies, as in the collapsing methodology, that is the basis of denying a separate rate, but is rather the independence from government control with regard to export activities. AT&M Comments at 4-5. At this point, the court regards the discussion as academic. Whatever their motivation, both tests obviously overlap on such matters as level(s) of ownership, the extent to which companies are directed by the same employees or board members, and interdependency of intertwined operations such as through involvement in production and pricing decisions or financing, *et cetera*. *Cf.* 19 C.F.R. § 351.401(f) *with Sparklers*, *supra*, 56 Fed. Reg. at 20589 (respondent's argument "that there is no evidence of *coordination* among the companies on such matters as price setting, market division, and production practices") (italics added). As to the DSMC's other concern, of whether there will be a future review period, they are, of course, aware that the court is bound to let the chips must fall where they must.

### IV. Conclusion

The court appreciates that Commerce labors under constraints, administrative and

other, wise or not, in reaching determinations entitled to a presumption of administrative regularity,[22]

but at this point the results may not be sustained on the bases articulated by Commerce.  Remand is

---

[22]  Cool and deliberate, true judgment is tied to the mast and impervious to seductive song. *But cf., e.g., An Analysis of State-owned Enterprises and State Capitalism in China* at 3, 92 (U.S.-China Economic and Security Review Comm., Oct. 26, 2011) (italics added):

When it joined the WTO in 2001, China promised that the government would not influence, directly or indirectly, the commercial decisions of [state-owned enterprises ("SOEs")].  China does not appear to be keeping this commitment. *The state does influence the commercial decisions of SOEs* and the most recent five-year guidance does not herald a change in this regard.  If anything, China is doubling down and giving SOEs a more prominent role in achieving the state's most important economic goals.
            * * *
The [PRC] government's prominent economic role, coming a decade after China joined the WTO, throws into doubt expectations that China's WTO membership would lead it to pull back from market interventions.   The back-and-forth between China's representative and the Working Party [of the WTO] on China's accession [to the WTO] is memorialized in the Working Party Report. As the following text from the report demonstrates, China itself encouraged these expectations:

The representative of China further confirmed that China would ensure that all state-owned and state-invested enterprises would make purchases and sales based solely on commercial considerations, *e.g.,* price, quality, marketability and availability, and that the enterprises of other WTO Members would have an adequate opportunity to compete for sales to and purchases from these enterprises on non-discriminatory terms and conditions. In addition, the Government of China [promised it] would not influence, directly or indirectly, commercial decisions on the part of state-owned or state-invested enterprises, including on the quantity, value or country of origin of any goods purchased or sold, except in a manner consistent with the WTO Agreement.

The Working Party took note of these commitments.  But given the strong state direction embodied in the 12th Five Year Plan, as well as the incentive structure facing the leaders of China's SOEs, it is clear that SOEs will continue to be driven by government policies. . . ."

therefore necessary for reconsideration and clarification in accordance with the foregoing. As to

what that implies for purposes of remand, no opinion is here expressed, except that the court

emphasizes it is not here substituting judgment for that of Commerce on these issues or insisting

upon application of the separate rates test in a certain way in contravention of *Arkansas v. Oklahoma*,

503 U.S. 91, 113 (1992). The court simply seeks to discern the reasonableness of a determination,

and the wisdom to do so. If necessary, upon remand Commerce may re-open the administrative

record to gather additional information.

### Analysis of 30CrMo Steel Plate Valuation

#### I. Background

In the original final results, based upon certain verification report exhibit records

Commerce calculated the surrogate values for the AT&M entity's 30CrMo steel plate inputs for the

manufacture of diamond sawblade cores using Indian Harmonized Tariff Schedule provisions

covering alloy steel plate both above and below 600mm wide, in a variety of thicknesses,. *See* RR

at 11-12; *see also* I&D Memo at 74. This decision was voluntarily remanded.

#### II. Summary of Remand and Results

On remand, Commerce accepted the AT&M entity's arguments and recalculated the

30CrMo steel input based only upon Indian HTS categories covering steel plate of widths of 600mm-

and-greater and rejected using the two categories for below-600mm. *See* RR at 11. Commerce

justified this result on the ground that the "raw material purchase documentation for 30CrMo steel

plate on the record only shows that the AT&M Entity purchased it in widths of either 1210mm or

1050mm," and on the ground that it its verification team was provided a worksheet by company

officials "demonstrating the total purchases of steel during the POI," from which the team noted "the purchases of 30CrMo were clearly for steel sheets with dimensions listed on the invoices." *Id.* at 26-27, referencing Verification Report at 27 & Ex. 12, and BGY's Nov. 3, 2005 Supp. Q. Resp. at Ex. SD-4, 16-17. Commerce found that "the measurements in the column in the inventory-out log refer to the diameters of the finished product being produced from the 30CrMo steel which was withdrawn, as opposed to the widths of the 30CrMo steel plate input itself." *Id.* at 27.

### III. Discussion

This decision is not fully explained, and the record evidence upon which Commerce relies does not fully support its conclusion. In large part, the analysis contradicts, without adequate explanation, Commerce's analysis of record documents for similar inputs. The record indicates that neither the invoices nor the other purchase documents on the record reflect all of the steel plate that the AT&M purchased during the POI, therefore the fact that the record does not contain invoices showing the purchase of 30CrMo steel less than 600 mm wide is not dispositive of whether such goods were purchased. The referenced Exhibit 12, *supra*, consists in part of two pages of a purchase subpedger memorializing purchases of steel plate in two non-consecutive months during the POI, plus an invoice for 30CrMo steel matching to the first entry on the first page of the subledger. No invoices are provided to match the entries on the second page of the subledger. The DSCM also pointed out that the 30CrMo steel purchase documents provided in AT&M's questionnaire response do not match, in either quantity or value, any of the entries on the purchase subledgers. Thus, it would appear that the subledger pages on the record do not reflect all of AT&M purchases of steel plate and that the invoices and other purchase documents on the record do not account for all such

purchases. As such, the DSMC correctly argue that it is unreasonable for Commerce to rely on the above purchase record evidence to find that "no" purchases of sheet under 600 mm wide occurred and remark that the record is "bereft" of any indication that BGY purchased 30CrMo steel in widths under 600mm, *see infra*, when other record evidence may be readily construed to indicate that such purchases were in fact made.

The DSMC argue it is "highly unlikely" that the dimensional values in AT&M's inventory out-logs represent finished diamond sawblade widths as found by Commerce, rather than the width of the input steel. The DSMC in particular point to the fourth line item of the raw material subledger referencing a particular quantity -- to the hundredth kilogram -- of 30CrMo steel and its amount in renminbi. *See* Ex. 12, *supra*, at 7. Because the inventory-out record, Ex. 12 at 11, records the removal of exactly those same amounts, it would seem clear, as the DSMC argue, "that the inventory-out record refers to the same 30CrMo steel as the raw material subledger." Commerce accepted AT&M's explanation that the dimensional values described in the inventory-out record reflect those not of the 30CrMo steel input but to the dimensions of the end product. The DSCM contend AT&M has not explained why it would record the dimensions of as-yet-unproduced finished goods in its raw material inventory records.

The DSMC also argue AT&M has conceded that the dimensional values recorded in its inventory logs reflect the dimensions of input steel, not output cores. Commerce confirmed that AT&M uses 65Mn steel plate in widths under 600 mm by comparing a subledger showing the purchase of a particular quantity of that steel in kilograms with an inventory-in log showing the placement of that quantity of steel into inventory. I&D Memo at 74; *see also* Ex. 12, *supra*, at 1, 4.

Consol. Court No. 09-00511                                          Page 35

The purchase subledger did not indicate the dimensions of the purchased steel. *See* Ex. 12 at 1.

However, like the inventory-out log, Ex. 12 at 11, this inventory-in log contained a second column

with dimensional values. *See id.* at 4, 11. On the basis of these, Commerce determined that the

AT&M entity purchased 65Mn steel in dimensions less than 600mm wide. I&D Memo at 74. And

in its motion brief for judgment, the AT&M entity relied on the "validity" of this determination to

support its arguments, apparently since abandoned,[23] on the proper valuation of 65Mn steel.

AT&M's Brief at 42. This, the DSMC contend, indicates AT&M's concession that the dimension

values recorded in its inventory logs reflect the dimensions of input steel, not output cores.

   Even apart from that, the DSMC contend, the original determination regarding 65Mn

steel and the remand determination for the 30CrMo steel creates a logical contradiction that

Commerce has not addressed. Commerce found that with respect to inventory-out records for

---

   [23] In their Rule 56.2 brief, AT&M also assigned error on the Indian HTS categories used in the original determination as surrogate values for its 65Mn steel. In the preliminary determination, Commerce valued the AT&M entity's 65Mn steel using an average of Indian HTS categories 7209.16,20, 7209.16,30, and 7209.16,50. The DSMC argued in their rebuttal brief that the facts of record justified using only Indian HTS 7211.29.50. Commerce agreed in part. For the final determination, Commerce dropped using HTS 7209.16,20, 7209.16,30, and 7209.16,50, and instead used 7211.29.50 -- as well as 7209.25.20, 7209.25.30, 7209.26.20, 7209.27.20, and 7209.27.30. Commerce reasoned these changes because "there was no information on the record to support the continued use of HTS numbers 7209.16.20 and 7209.16.30, as all items in inventory for 65Mn steel listed in BGY Verification Report at Exhibit 12, as well as invoices provided in BGY's second supplemental response dated December 5, 2005, are coils in widths less than 600 mm." I&D Memo at 74. In its 56.2 brief, AT&M pointed out that HTS heading 7209 covers "flat-rolled products of iron and non-alloy steel, of a width of 600 mm or more, cold-rolled (cold-reduced), not clad, plated or coated" while HTS heading 7211 covers "flat-rolled products of iron and non-alloy steel, of a width less than 600 mm, not clad, plated or coated," and argued that Commerce's refusal to use HTS 7209.16.20 and 7209.16.30 on the ground that the categories were for steel of 600 mm and above but adoption of five other categories under HTS 7209 which were for 600 mm and above is contradictory and unsupported by substantial evidence or plain logic and therefore required reconsideration. As mentioned, AT&M appears to have since abandoned this argument. *Cf.* Pls' Reply to Def. and Def-Int's Opp. to Pls' Rule 56.2 Mot. for J. on the Agency Record at 5-8.

30CrMo steel, the second column reflects the dimensions of as yet unproduced finished goods. *See,*

*e.g.*, RR at 11-12, 26-27. But, the record also contains inventory-out records for 65Mn steel plate,

with dimensional values matching to those seen in the inventory-in records for the same type of steel.

Verification Report, Ex. 12 at 4, 9-10.

> Commerce dismissed the DSMC's argument with the following:

> [S]imply because some measurements overlap does not mean that any definitive
> conclusions can be drawn from such observation and then applied to the 30CrMo
> steel input. The inventory-in records for 65Mn steel clearly show purchases of less
> than 600mm in width, indicating BGY purchased this input in widths closer to the
> diameters of the finished product than it did for 30CrMo steel. In contrast, the record
> is absolutely bereft of any indication that BGY purchased 30 CrMo steel in widths
> under 600mm.

RR at 27.

At this point the court must ponder why the dimensions of input steel are recorded

in both the inventory-in and inventory-out records for 65Mn steel but not for 30CrMo steel, but

cannot speculate. The DSMC also point out that the fact that the dimensions recorded in the second

column of the 65Mn inventory-in and inventory-out records *match exactly* tends to discount the

argument that the inventory-out records show the dimensions of finished cores, because an exact

match between the figures would seem to leave no room for scrap or error whatsoever in cutting

cores from the input plates. The court must therefore agree with the DSMC that this situation

appears to be more than mere "overlap" -- after all, the -in and -out 65Mn steel records and the

30CrMo steel records are formatted nearly identically and record what appears to be the same kinds

of information, including dimensional values. *See* Verification Report, Ex. 12 at 4, 6, 9-11.

## IV. Conclusion

For the above reasons, the matter of the 30CrMo steel inputs valuation will also be remanded for further explanation or reconsideration.

A separate and confidential order of remand to the above effect will be issued herewith.


/s/ R. Kenton Musgrave
R. Kenton Musgrave, Senior Judge

Dated: November 30, 2012
       New York, New York