Slip Op. 13 - 129

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| ADVANCED TECHNOLOGY & MATERIALS CO., LTD., BEIJING GANG YAN DIAMOND PRODUCTS COMPANY, and GANG YAN DIAMOND PRODUCTS, INC., | : <br> : <br> : <br> : <br> : <br> : |
| Plaintiffs, | : Before: R. Kenton Musgrave, Senior Judge <br> : Consol. Court No. 09-00511 |
| BOSUN TOOLS GROUP CO. LTD, | : <br> : |
| Plaintiff-Intervenor, | : <br> : |
| v. | : <br> : |
| UNITED STATES, | : <br> : |
| Defendant, | : <br> : |
| and | : <br> : |
| DIAMOND SAWBLADES MANUFACTURERS COALITION, WEIHAI XIANGGUANG MECHANICAL INDUSTRIAL CO., LTD., and QINGDAO SHINHAN DIAMOND INDUSTRIAL. CO., LTD., | : <br> : <br> : <br> : <br> : |
| Defendant-Intervenors. | : <br> : |

## OPINION

[Sustaining second remand results of antidumping duty investigation of diamond sawblades and parts thereof from the People's Republic of China.]

Decided: October 11, 2013

*Jeffrey S. Neeley*, *Michael S. Holton* and *Stephen W. Brophy*, Barnes, Richardson & Colburn, of Washington DC, for the plaintiffs.

*Melissa M. Devine*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington DC, for the defendant.  With her on the brief were *Stuart F.*

*Delery*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Franklin E. White*, *Jr.*, Assistant Director. Of Counsel on the brief was *Nathaniel J. Halvorson*, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce.

     *Daniel B. Pickard* and *Maureen E. Thorson*, Wiley Rein, LLP, of Washington DC, for defendant-intervenor Diamond Sawblades Manufacturers Coalition.

     Musgrave, Senior Judge: Before the court are the second results of remand ("Second Remand Redetermination" or "*RR2*") from the U.S. Department of Commerce, International Trade Administration ("Commerce" or "Department") on the investigation into sales from the People's Republic of China ("PRC") of diamond sawblades and parts thereof at less than fair value ("LTFV"). *See* Slip Op. 12-147 (Sep. 30, 2012).[1]   The Second Remand Redetermination indicates it is conducted "under protest"[2] in determining the AT&M entity[3] ineligible for an antidumping duty rate separate from the PRC-wide rate after Commerce found AT&M did not choose its own management autonomously from the PRC state.   *RR2* at 20.   This redetermination mooted the only other issue remanded for further explanation or reconsideration, *i.e*, surrogate valuation of 30CrMo steel inputs.

---

[1]   36 CIT ___, 885 F. Supp. 2d 1343.  *See also Diamond Sawblades and Parts Thereof From the People's Republic of China*, 71 Fed. Reg. 29303 (May 22, 2006) (final LTFV determination) (*"Final Determination"*), *as amended*, 71 Fed. Reg. 35864 (June 22, 2006).   The period of investigation ("POI") is October 1, 2004, through March 31, 2005.

[2]   *See*, *e.g.*, Second Remand Redetermination at 3, n.8, referencing *Viraj Group, Ltd. v. United States*, 343 F.3d 1371 (Fed. Cir. 2003).   Unlike *Viraj Group*, however, and as further discussed below, this matter does not involve "a contrary position forced upon it by the court."   *See* 343 F.3d at 1376; *see also* DSMC's Comments on Second Remand Redetermination at 17-19.

[3]   The original respondent was Beijing Gang Yan Diamond Products Company ("BGY"). During the course of the underlying investigation Commerce learned that BGY was affiliated with AT&M, which in turn was part owner of Yichang HXF Circular Saw Industrial Co., Ltd. ("HXF"), another exporter of diamond sawblades.   *See* BGY's Supp. Section A QR, dated September 20, 2005.  Finding all three companies to be affiliated, Commerce  collapsed them to a single "AT&M entity." *See* Memorandum to the File dated Dec. 20, 2005, PDoc 481 ("Collapsing Memorandum").

The defendant and the petitioners-plaintiff, Diamond Sawblades Manufacturers Coalition ("DSMC") argue for sustaining those results, while the three respondents comprising the collapsed "AT&M entity," Advanced Technology & Materials, Co., Ltd. ("AT&M"), BGY, and Gang Yan Diamond Products, Inc., argue for further remand.  The Second Remand Redetermination complies with the order of remand and will therefore be sustained.

## I. *Background*

Immediate background is here provided, and familiarity with prior proceedings is presumed.  The court previously examined the analysis, statements and conclusions of the First Remand Redetermination in the context of the available information of record and remanded, *inter alia*, the separate rate redetermination for the AT&M entity.  Holding that the redetermination could not be sustained on the bases articulated by Commerce, it appeared to the court that important aspects of the problem had not been considered, and explanations counter to the evidence of record had been offered.  *See generally* 885 F. Supp. 2d 1343.  Those concerns may be reduced to the following: (1) Commerce's interpretation of "autonomy" in the selection-of-management prong of the separate rates test and its regard of the "ownership" of separate rate applicants for that purpose; (2) Commerce's analysis of the three PRC laws and regulations of record; (3) the factual bases for Commerce's analysis of the AT&M entity; and (4) Commerce's articulation of the separate rate test generally, the relationship between *de jure* and *de facto* analyses, and specific questions arising therefrom as identified in the court's order.  Remanding these concerns for reconsideration and clarification, the court concluded as follows:

> As to what that implies for purposes of remand, *no opinion is here expressed*, except that the court emphasizes it is *not here substituting judgment for that of Commerce*

>   *on these issues or insisting upon application of the separate rates test in a certain*
>   *way* in contravention of *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992). The court
>   simply seeks to discern the reasonableness of a determination, and the wisdom to do
>   so. If necessary, upon remand Commerce may re-open the administrative record to
>   gather additional information.

885 F. Supp. 2d at 1363 (italics added).

## II.  Second Remand Redetermination

In the Second Remand Redetermination, Commerce's *de facto* analysis concluded

that the AT&M entity did not rebut the presumption of state control and is therefore not eligible for

a separate rate.  *See, e.g.*, *RR2* at 3, n.8 & 13.  Commerce first explained that "CISRI held a majority

share in AT&M at the outset of the period of investigation" and "given that CISRI was

wholly-owned by SASAC, government control had the potential to pass from SASAC through to the

AT&M Entity via CISRI" and thus "the question then must necessarily turn to whether this potential

is exercised here." *Id*. at 8.  Commerce then explained that "CISRI placed four of its senior officials

. . . on AT&M's board", that "these four board members were active in the selection of AT&M's

management", and that of "the five AT&M board members that were not CISRI officials, all were

nonetheless nominated by CISRI." *Id*. at 8-9.  Commerce addressed the additional evidence

regarding AT&M's and BGY's management, *see id.*, and concluded that "record evidence

demonstrates that AT&M did not choose its own management autonomously." *Id*.  Thus, Commerce

determined that the "AT&M Entity is part of the [PRC]-wide entity and does not qualify for a

separate rate." *Id*.  The result of this determination mooted further consideration of the other issue

on remand, the surrogate valuation of 30CrMo steel inputs.

III.  *Discussion*

A.  Separate Rate Analysis

As prelude, neither DSMC nor AT&M urges further remand based upon Commerce's

*de jure* analysis or its decision that the valuation of steel inputs is moot.  Further, Commerce did not

make any *de facto* findings as to two of the four prongs, namely, whether the export prices are set

by or subject to approval by a Chinese government agency or whether AT&M has authority to

negotiate and sign contracts.  *See generally* Remand Redetermination. As to the prong analyzing

whether AT&M retains the proceeds of its export sales and makes independent decisions regarding

disposition of profits or financing of losses, Commerce determined that "[t]he record holds little

evidence as to how interrelated finances between AT&M and CISRI influenced export functions."

*Id*. at 21. No party contests this finding; the only issue before the court is Commerce's finding on

the remaining prong of the *de facto* analysis that AT&M did not demonstrate autonomy from the

PRC government in its selection of management.

As further prelude, there are several interpretive nits to which the Second Remand

Redetermination's analysis draws attention, which are aside from its findings.  For example, in

addition to note 2, *supra*, Commerce files disagreement with the "rejection" of its First Remand

Redetermination "regarding the full effects of the SASAC Interim Regulations (and the weight it

should be given) in the broader *de jure* and *de facto* analysis, especially with respect to control over

export activities, that comprises the Department's separate rate test and the impact of ownership

here, and are conducting the remand under protest." *RR2* at 20 n.47; *see infra*.  The court only stated

that the First Remand Redetermination could not be sustained as articulated; it expressed no opinion

whatsoever on the "weight" the Interim Regulations should be given in the broader *de jure* and *de facto* analysis.  With respect to "control over export activities," the opinion merely drew attention to those provisions that facially appeared to have some bearing on that analysis in order to elicit from Commerce further clarification and/or re-analysis on remand.  On remand, Commerce was entirely free to explain any analytical error in the opinion or clarify its own earlier analyses in order to aid the court's understanding.

In addition, under a section entitled "Court's Analysis of Ownership" [*sic*] the Second Remand Redetermination states that the court "began its analysis by observing that CISRI's[ ] ownership of AT&M should be considered relevant despite the Department's long-standing practice of finding that corporate form *may* insulate a company from government control.[ ]"  *RR2* at 3 (italics added, footnotes omitted).  That does not quite restate the First Remand Determination's actual statement of that practice; the First Remand Determination  stated, in essence, that corporate form, *per se*, entirely insulates a company from government control, whereas the prior opinion only observed (again) that it is "settled" that government ownership alone is not dispositive of control. *See* Slip Op. 11-122 (Oct. 12, 2011) at 14, referencing *Qingdao Taifa Group Co., Ltd. v. United States*, 33 CIT 1090, 1100, 637 F. Supp. 2d 1231, 1242 (2009).  The opinion then observed that "corporate form in and of itself has never been found to 'demonstrate' insulation from governmental control [and been found dispositive on the absence of *de jure* control], or further *de jure* proof of the absence thereof in accordance with the separate rate test would serve no purpose."  885 F. Supp. 2d at1350.  That is simply a point of logic, not analysis of ownership.  The Second Remand Redetermination seems to disclaim the point, but the redetermination also reflects Commerce's own

independent findings notwithstanding, *i.e.*, "[i]n response to and consistent with the Court's analysis . . . the Department finds that ownership is relevant to the separate rates analysis to the extent that ownership, as well as the degree of ownership, affects *de facto* control". *RR2* at 3.

The Second Remand Redetermination also states with regard to the PRC Interim Regulations that the court "*held* that the Department incorrectly treated the implementation of the Interim Regulations as a form-over-substance change in the law" and "failed to recognize that these regulations *were* an 'obvious declaration of re-centralized *de jure* control'" *RR2* at 4 (italics added). This, too, does not quite restate the case. The quoted observation by the court pertains to Interim Regulation Article 11, which provides that SASAC's "invested enterprises shall accept the supervision and administration conducted by the State-owned assets and administration authority according to law", upon which the court merely opined "[t]his *seems* an obvious declaration of *re-centralized de jure* control" (italics added in part). 885 F. Supp. 2d at 1351. But seeming does not make it so -- that is still for Commerce to decide. *See*, *e.g.*, *RR2* at 17 ("Pursuant to our examination of the Court's opinion and remand order, we found that the SASAC law creates the potential for control, as opposed to definitively establishing either the absence of *de jure* government control or complete independence over export activities. Recognizing that the *de jure* evidence in this case did not clearly settle the issue of *de jure* control, we further scrutinized the record evidence to see if it substantiates an absence of *de facto* control. . . ."). Consistent with the standard of review on these administrative determinations, such an observation by the court is properly construed as dicta, not a "holding" or *ratio decidendi*. More precisely, the opinion only attempted circumspect examination of whether the substantial evidence of record supported Commerce's conclusions on the Interim

Regulations[4] through juxtaposition of them against the undiscussed and seemingly contradictory evidence of record.  *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *see, e.g.*, *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994).

Further remand at this point, however, to readdress these and other like points, appears unlikely to impact the results of remand.  The court will therefore proceed.  *Cf. SKF USA, Inc. v. United States*, 30 CIT 1402, 452 F. Supp. 2d 1335 (2006) (sustaining remand results after striking misconstrued matters), *vacated on other ground*, 512 F.3d 1326 (Fed. Cir. 2008).

AT&M strongly disagrees with the Remand Redetermination as contrary to Commerce's longstanding practice, as logically unexplained, and as unsupported by the facts of record.  It argues that it is not a producer or exporter of subject merchandise or a respondent in this case but is a shareholder in companies that produce such merchandise, that Commerce's approach has been to determine whether the exporters (BGY for diamond sawblades and HXF for cores), which are part of the AT&M entity, have independence with regard to their export activities rather than in some general independence from all governmental influence, and that the fact that Commerce has collapsed the companies for the purpose of applying one antidumping deposit rate does not mean that the companies act as one unit in selling subject merchandise or in setting prices but rather Commerce has made the distinction between the collapsing analysis and the separate rates analysis "very clear".  AT&M Comments at 2-3, quoting *Persulfates From the People's Republic of China*,

---

⁴ *E.g.*, Commerce earlier had concluded that "the Interim Regulations do not automatically demonstrate *de jure* control of a state-owned enterprise[,]" and that the Interim Regulations "set[ ] aside particular protections for the autonomy of companies operating under SASAC, showing that SASAC solely provides oversight and is not intended to direct day-to-day business operations" and does not "interfere [in] or influence" the latter.  First Remand Redetermination at 20-21.

62 Fed. Reg. 27222 (May 19, 1997) (final determination), issues and decision memorandum at cmt. 2 ("The Department has a longstanding methodology for determining whether companies in a nonmarket economy are entitled to a separate rate. That methodology is separate and distinct from the 'collapsing' methodology in both focus and function. On the one hand, the separate rates test focuses specifically on whether there is government control of a nonmarket company's export activities. On the other hand, the 'collapsing' methodology focuses on the relationship between two or more affiliated companies, not their relationship vis-a-vis the government or other entities. There is no basis for applying a 'collapsing' analysis in this case.").

The court has previously addressed similar points and perceives no reason for altering its prior opinion. *See*, *e.g.*, 885 F. Supp. 2d at 1349 ("There is no dispute that the focus of the separate rates test here is the AT&M entity's export operations, that Commerce's test applies only to exporters, and that CISRI is not an exporter, but CISRI is still an owner, and even the AT&M entity agrees consideration of that ownership is relevant.") & 1362 n.21 ("Whatever their motivation, both [the collapsing and separate rate] tests obviously overlap on such matters as level(s) of ownership, the extent to which companies are directed by the same employees or board members, and interdependency of intertwined operations such as through involvement in production and pricing decisions or financing, *et cetera*. *Cf.* 19 C.F.R. § 351.401(f) *with Sparklers From the People's Republic of China*, 56 Fed. Reg. 20588 (May 6, 1991) (final LTFV determination)] . . . at 20589 (respondent's argument 'that there is no evidence of *coordination* among the companies on such matters as price setting, market division, and production practices') (italics added)").

Next, AT&M takes issue with Commerce's *de facto* finding of the absence of independence, characterizing it as based solely on the corporate structure of the companies, the

appointment of the officers of the companies, and the voting rights of the companies. AT&M

contends there is no discussion of any facts showing the PRC government being involved in making

export-related investment, pricing and output decisions of any producer of subject merchandise

affiliated with AT&M, or choosing customers in the United States or in any other market, no

discussion of what new standard is being applied, if any, to determine government control or lack

thereof, and no discussion of what degree of influence on such decisions would be necessary for

there to be *de facto* control, and it identifies two "logical flaws" in the remand redetermination, the

first of which, it argues, is that the redetermination "makes the leap" from "may constitute evidence"

to  "record evidence demonstrates that AT&M did not choose its own management autonomously"

and therefore Commerce found "that the AT&M Entity is part of the PRC-wide entity and does not

qualify for a separate rate.'"  *See* AT&M Comments at 4.  AT&M argues Commerce's discussion

does not hang together logically, in that certain facts are said to be of a nature that they "may

constitute evidence" but are not stated to actually constitute evidence.   AT&M asks why, if

Commerce had found that the facts "are" evidence rather than being items that "may constitute"

evidence, did Commerce find that they are compelling evidence?

   The defendant's response is telling: "Regardless of its use of the word 'may,'

Commerce explicitly found that . . . CISRI (a 100-percent state-owned entity) was 'active in the

selection of AT&M's management.'"  Def's Resp. at 7, quoting *RR2* at 9.  The point is that "because

AT&M had not shown autonomy in choosing its own management, Commerce found that AT&M

had failed to rebut the presumption of state control."  *Id.*, referencing *id*.

   Next, AT&M contends there is no discussion of why Commerce made the

counterfactual finding that CISRI is the equivalent of the PRC government. "If the Department

actually is making a determination that entities such as CISRI are the equivalent of the [PRC] government, then it must offer evidence from the record in support of its conclusion" and explain why the "shareholder of the shareholder of the exporter" can be said to be influencing exports within the meaning of the separate rates test.  AT&M Comments at 4.

This argument, however, seems to invert the burden of proof on the presumption.  The defendant's response is again telling:

> . . . AT&M does not actually take issue with the four prongs making up Commerce's separate rates test.  *See generally* AT&M Comments.  To the extent AT&M claims that Commerce did not sufficiently address or analyze the three other prongs, as Commerce explained: "the appointment of company officers and senior managers directly relates to one of the explicit *de facto* criteria and *each* of the *de facto* prongs must be satisfied for a company to get a separate rate." [Second] Remand Redetermination at 20 (emphasis added).  Commerce determined that -- in the context of this Court's previous determinations -- the AT&M entity did not satisfy the management prong with respect to independence from the government, and ended its analysis there.  *See id.* at 13.

Def's Resp. at 6 (italics in original).

AT&M next calls attention to the Second Remand Redetermination's statement that "[i]n both [*de jure* and *de facto*] analyses, the central question is whether the control is applied (and not just potential), regardless of the mechanism."  *RR2* at 14.  AT&M posits that "[t]his is precisely correct and summarizes the approach of the Department for many years."  AT&M Comments at 5.  AT&M then argues "the discussion . . . with regard to CISRI and AT&M makes no logical sense in light of those announced standards of applied control."  However, the court finds the discussion to be based on a lack of evidence of record to rebut the presumption of government control, which is in accordance with the purported separate rate test, and therefore logical.  *See* Import Administration Policy Bulletin 05.1 (Apr. 5, 2005).

AT&M further argues that Commerce failed to explain whether the Second Remand Redetermination constitutes a new practice or the application of Commerce's past practice.  AT&M Comments at 5-7.  It contends that if Commerce cannot explain its policy, then it must abandon it and not apply separate rates here or in other cases.  AT&M complains that CISRI is not the company being reviewed for export pricing, BGY is, and that "there is simply no evidence of record, even if CISRI is government controlled, that CISRI is setting prices or otherwise affecting exports for a company two levels down.  Indeed, Petitioner does not even attempt to make this argument."  *Id.* at 5-6.  More broadly:

> The argument with regard to management also fails because it does not link the selection of management to the [PRC] government, but at most, to a company that Petitioner says is owned by the [PRC] government.  Petitioner argues that CISRI selects all management.  The Department then stated: "Thus, record evidence demonstrates that AT&M did not choose its own management autonomously.  Therefore, we find that the AT&M Entity is part of the PRC-wide entity and does not qualify for a separate rate."

> What does it mean that the company "does not choose its management autonomously"?  Neither does General Motors or Apple.  All shareholder companies such as GM or Apple or AT&M have their management chosen by a board of directors which are elected by the shareholders.  In fact, GM has U.S. government ownership.  If the Department is stating that if shareholders who are government-owned choose management, then the government *per se* is setting its export prices and policies, then it must explain how it arrives at this conclusion.  It also should explain in detail what facts on the record or what policy leads to this conclusion.  If not, and if it is continuing its traditional approach where it looks for factual proof of actual influence on prices, then it should say that.

> Even if it is true that CISRI is choosing top management of the publicly traded company, AT&M, how does this translate two levels down to setting the selling prices for diamond sawblades by BGY to the United States or otherwise influencing exports?  How does the Department think this mechanism works?  By Petitioner's own argument, CISRI is not the Chinese government, but rather a state-owned company.  Thus, even under the Petitioner's theory of the case, a

> shareholder of AT&M is influencing decisions about who is to be the management
> of the company, not the Chinese government.

*Id*. at 6-7.

The defendant response is again telling: "AT&M overlooks that Commerce addressed this issue in the [Second] Remand Redetermination, and explained that it was not replacing its prior practice but was altering its analysis under protest given this Court's prior remand orders. *See* [Second] Remand Redetermination at 20, n.47 ('we respectfully disagree with the Court . . . and are conducting the remand under protest. In the First Remand Redetermination, we provided a detailed analysis of how our original decision in the *Final Determination* was correct and supported by record evidence, and we maintain that those determinations were appropriate.')." Def's Resp. at 7 (italics removed in part). Notwithstanding such disclaimer, however, the court fails to discern any "altering" in the Second Remand Redetermination of the separate rate test, as opposed to a straightforward application of it, as the test purports, based on the administrative record, and as requested. *See* Import Administration Policy Bulletin 05.1 ("whether the respondent has autonomy from the central, provincial and local governments in making decisions regarding the selection of its management"). The court can agree with AT&M that Commerce has not been more forthcoming in offering a fuller explanation its test and policy, but calling for paying proper attention to the process by which corporate management is chosen is rather the point this aspect of the DSMC's claims, and the analogy to direct U.S. government involvement in U.S. corporations does not persuade that Commerce's presumption of state control in NME economies, and its burdening of respondents with demonstrating the absence of such control, can be concluded unreasonable, at least on the basis of that factually distinguishable analogy.

AT&M lastly argues on the separate rate issue that Commerce's determination is based upon a mistranslation regarding minority shareholder voting rights. AT&M Comments at 7-8 (arguing that PRC law does not preclude minority shareholders from forming a voting block to out-vote CISRI).  The court's previous opinion took the record of PRC law[5] into account, *see also*, *e.g.*, 885 F. Supp. 2d at 1357-58 & n.15, and Commerce addressed the issue in the Second Remand Redetermination by explaining that even if the law permitted such a voting block, no such voting block formed or took action during the period of investigation in any event.  *See RR2* at 21 ("As to the AT&M Entity's argument about the 10-percent ownership threshold for nominating directors, the record contains no evidence of any such group of shareholders joining to nominate a board candidate.").  As such, any alleged mistranslation would be moot.

### B.  Whether the PRC-Wide Rate Is An "Adverse" Rate

AT&M argues that Commerce as a matter of law cannot apply an "adverse rate" to the AT&M entity by assigning it the PRC-wide rate -- a rate based on adverse facts available -- because the AT&M entity cooperated with Commerce's investigation.  *See* AT&M Comments at 8-10.  But Commerce did not apply adverse facts available to AT&M, Commerce rather found that AT&M had not rebutted the presumption of state control and assigned it the PRC-wide rate. "These are two distinct legal concepts: a separate AFA rate applies to a respondent who has received a separate rate but has otherwise failed to cooperate fully whereas the PRC-wide rate applies to a

---

[5]  On this, AT&M also contends Chapter 3, Article 49, of the Code of Corporate Governance for Listed Companies in the PRC requires the appointment of independent directors, Article 50 requires the independent directors to protect the interest of minority shareholders, and "[h]ad CISRI been able to nominate all of the directors, this provision of law would have been violated."  The conclusion does not appear valid, however, since nomination and appointment are distinct.

respondent who has not received a separate rate." *Watanabe Group v. United States*, 34 CIT ___,

___, Slip Op. 10-139 at 9 n.8 (2010), citing *Since Hardware (Guangzhou) Co. v. United States*, 34

CIT ___, Slip Op. 10-108 at 23 (Sep. 27, 2010)).  To the extent AT&M suggests that Commerce may

never apply adverse facts available (or, for that matter, facts available) in calculating a PRC-wide

rate, its references do not support the proposition.

　　　　　　AT&M also alleges that because it was not found to be separate from the PRC

government and because it cooperated in the proceedings, the PRC-wide entity should be considered

cooperative and, therefore, application of the adverse-facts-calculated PRC-wide rate was in error.

*See* AT&M Comments at 10-11.  The defendant argues AT&M's argument does not take into

account that 13 other PRC-wide companies failed to cooperate, Def.'s Resp. at 9, quoting *RR2* at 22,

but the rejoinder is inadequate; rather, "Commerce's permissible determination that [a respondent]

is part of the PRC-wide entity means that inquiring into [that respondent]'s separate sales behavior

ceases to be meaningful."  *Watanabe*, Slip Op. 10-139 at 8.  "[A]s losing all entitlement to an

individualized inquiry appears to be a necessary consequence of the way in which Commerce applies

the presumption of government control, . . . applying a countrywide AFA rate without individualized

findings of failure to cooperate is no different from applying such a countrywide AFA rate without

individualized corroboration." *Jiangsu Changbao Steel Tube Co., Ltd. v. United States*, 36 CIT ___,

___, 884 F. Supp. 2d 1295, 1312 n.21 (2012), referencing *Watanabe*, Slip Op. 10-139 at 8.  For that

reason, this court is unable to find Commerce's application of the PRC-wide rate to the AT&M

entity on remand improper.

C.  Presumption of State Control and Countervailing Duties

Finally, AT&M makes a sweeping objection to the presumption of control applied to NME countries, arguing that Commerce should have eliminated its separate rates practice altogether in light of its application of countervailing duties to the PRC.  It may be worth setting forth the full argument at length, for future reference:

> The presumptions underlying the separate rates approach are no longer valid. Indeed, the presumption is backwards, as is apparent from the Department's own words and practice -- the only presumption that is supportable is the presumption that [PRC] companies are not controlled by the [PRC] government [. . .] but that presumption can be overcome by facts on the record.

> The Department's presumption that "all firms within a non-market economy country ("NME") are subject to government control and thus should all be assigned a single, countrywide rate unless a respondent can demonstrate an absence of both *de jure* and *de facto* control over its export activities," is contradicted by the Department's decision to change its practice concerning the application of the countervailing duty law.  In particular, the Department found that the "current nature of [PRC]'s economy does not" give rise to the same issues that were litigated in *Georgetown Steel*, mainly of which were "Soviet-style economies" that were essentially comprised of a single central authority or central control that would result in presumption of state ownership.  *See* Memorandum [. . .], re: *Countervailing Duty Investigation of Coated Free Sheet Paper from the People's Republic of China - Whether the Analytical Elements of the Georgetown Steel Opinion are Applicable to China's Present-Day Economy,* dated March 29, 2007, at 4 [. . ..]

> A major basis for the Department's conclusions and change in its practice concerning the application of CVD laws was a factual finding "that market forces now determine the prices of more than 90 percent of products traded in China." [*Id.*] at 5.  Similarly, the Department found that the China's "current Labor Law grants the right to set more wages above the government-set minimum wage to all enterprise's, including foreign invested enterprises ("FIE"), SOEs and domestic private enterprises." [*Id.* . . .]

> These clear findings contradict the [Department]'s presumption in the antidumping separate rates practice that "all firms within a non-market economy country are subject to government control and thus should all be assigned a single, country-wide rate unless a respondent can demonstrate an absence of both *de jure*

and *de facto* control over its export activities." At a minimum, the Department's decision to enforce the CVD laws based on the above conclusions clearly indicates that at least with *de jure* control, interference by the government in a companies' exports activities can no longer simply be presumed, since the 1994 Company Law (as amended in 2006) requires that all companies make all export decisions independent from Chinese governmental control. Moreover, the Department has consistently found an absence of *de jure* control when a company has supplied business licenses and export licenses, each of which have been found to demonstrate an absence of restrictive stipulations and decentralization of control of the company based on the Company Law [. . ..]

Furthermore, the Department's finding "that market forces now determine the prices of more than 90 percent of products traded in China," reverses any *de facto* presumption that China's government controls pricing. The presumption, by the Department's own reasoning, must be just the opposite -- the only justified presumption is one of government non-interference.

The Department specifically has found that "in recent years that many more companies export activities are independent from the PRC government in comparison with the early- to mid-1990s." [*Id.*] at 10.

The inconsistency between the AD presumption of state control and the factual findings made by the Department to justify CVD proceedings is obvious. The Department's presumption that all firms within a NME are subject to government control and thus should all be assigned a single, country-wide rate, in the AD proceedings is just the opposite of the findings that the Department used to justify bringing CVD cases. A presumption of state control implies that the [PRC] economy is nothing less "than the traditional communist economic system of the early 1980s, *i.e.*, the so-called 'Soviet-style economies'" that were at issue in *Georgetown Steel*, which the Department clearly now rejects based on its application of CVD law. *See*, *e.g.*, [*id.*] at 4.

Based on the above, the Department should not have applied the presumption of state control in this review but instead should be consistent with its findings used to justify bringing CVD cases and presume that no such state control exists unless record evidence shows otherwise.

AT&M Comments at 12-15 (citations omitted in part, bracketed editing added).

The court expresses no opinion at this point on whether AT&M's arguments are valid,

since, as the defendant points out, this claim appears beyond the scope of the remand. *Cf. RR2* at

22 (observing that "in the underlying investigation, no party challenged our factual finding with respect to the presumption of state control" over companies that did not provide separate rate applications and finding "no basis to change the presumption that the PRC is an NME country based on the record").  For purposes of this matter, at least, the Court of Appeals for the Federal Circuit has affirmed Commerce's application of the presumption to the PRC.  *See Sigma Corp. v. United States*, 117 F.3d 1401, 1405-06 (Fed. Cir. 1997).

IV.  *Conclusion*

For the above reasons, the court will sustain the second results of remand *sub nom. Final Results of Redetermination Pursuant to Remand Order[:] Diamond Sawblades and Parts Thereof from the People's Republic of China*, dated May 6, 2013.  Judgment will enter accordingly.

/s/  R. Kenton Musgrave
R. Kenton Musgrave, Senior Judge

Dated: October 11, 2013
        New York, New York